# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

FRANCISCO MENDEZ-NUNEZ,
    a/k/a "Pancholine,"
    a/k/a "Pancho,"
SALVADOR GARCIA,
    a/k/a "Chava,"
FRANCISCO MENDEZ JR.,
    a/k/a "Paco,"
JAVIER GARCIA,
    a/k/a "Javi,"
FRANCISCO SOTO,
JUAN DURAN,
    a/k/a "Juan Duran-Padilla,"
    a/k/a "Juanillo,"
OSCAR ANDRADE,
VICTOR VELAZQUEZ, and
DON MCNISH

**CRIMINAL COMPLAINT**

CASE NUMBER:

# 07CR 0851

## MAGISTRATE JUDGE SCHENKIER

**FILED**
12-19-07
DEC 1 9 2007

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

I, Matthew W. Holbrook, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning not later than in or about July 2006 and continuing through the present, in Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants did

> conspire with each other and with others to possess with intent to distribute and to distribute a controlled substance, namely, in excess of five hundred grams of mixtures and substances containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1);

in violation of Title 18, United States Code, Section 846, and Title 18, United States Code, Section 2.

I further state that I am a Special Agent, Drug Enforcement Administration, and that this Complaint is based on the following facts:

    **See Attached Affidavit.**

Continued on the attached sheet and made a part hereof:   __X__ Yes   ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

December 19, 2007 _____
Date

SIDNEY I. SCHENKIER, U.S. Magistrate Judge
Name & Title of Judicial Officer

at   Chicago, Illinois _____
City and State

_____
Signature of Judicial Officer

COUNTY OF COOK          )
                                 )    SS

STATE OF ILLINOIS         )

## AFFIDAVIT

I, Matthew Holbrook, being duly sworn under oath, state as follows:

1.　　　I am currently a Special Agent with the Drug Enforcement Administration ("DEA") assigned to the Chicago High Intensity Drug Trafficking Area ("HIDTA") Task Force, operated under the auspices of the DEA, an agency within the United States Department of Justice. I have been employed as a DEA Special Agent for approximately three years and have been assigned to the HIDTA Task Force for approximately two years. My primary duty is to investigate criminal violations of the federal controlled substance laws, including, but not limited to, Title 21, United States Code, Sections 841 and 846.

2.　　　During my employment as a DEA Special Agent, I have received specialized training in the means and methods by which drug traffickers unlawfully manufacture, import, distribute and possess with intent to distribute controlled substances, including, but not limited to, the use of telephones and numerical codes and code words to conduct drug trafficking activities. I have also received specialized training in the ways in which international drug trafficking organizations manufacture and smuggle controlled substances into the United States, as well as the means and methods by which international drug trafficking organizations export the proceeds of their drug trafficking activities.

3.　　　I have also received training regarding, and personally participated in, various types of investigative activity, including, but not limited to, the following: (a) physical surveillance; (b)

1

the debriefing of defendants, witnesses, informants and other individuals who have knowledge concerning the unlawful trafficking in controlled substances; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) the handling and maintenance of evidence; (g) electronic surveillance through the use of pen registers and trap and trace devices; and (h) the court-authorized interception of both wire and electronic communications (i.e., Title III wiretaps).

4.      The information contained in this affidavit is based upon multiple sources, including surveillance, interviews of cooperating witnesses and other individuals, the review of consensually recorded conversations, conversations recorded pursuant to court-authorized wire interceptions, video surveillance, interviews of other law enforcement officers and/or the review of their reports, and the review of witness statements. The information set forth herein is based on my personal knowledge, information provided to me from other law enforcement officials, as well as knowledge I have acquired through experience and training. The terms "agents" and "officers" are used interchangeably herein to include federal agents and/or police officers. This affidavit is being submitted for the limited purpose of establishing probable cause to: (a) arrest the individuals identified below; and (b) search certain locations described below. Accordingly, I have not included each and every fact known to me concerning this investigation.

5.      This affidavit is being submitted in support of a criminal complaint charging that between not later than July 2006 and December 2007, the following individuals conspired to possess with intent to distribute and to distribute in excess of 500 grams of mixtures and substances containing cocaine, in violation of Title 21, United States Code, Section 846:

(1)      FRANCISCO MENDEZ-NUNEZ a/k/a "Pancholine" a/k/a "Pancho"

2

(2)    SALVADOR GARCIA a/k/a "Chava"

(3)    FRANCISCO MENDEZ JR. a/k/a "Paco"

(4)    JAVIER GARCIA a/k/a "Javi"

(5)    FRANCISCO SOTO

(6)    JUAN DURAN a/k/a "JUAN DURAN-PADILLA" a/k/a "JUANILLO"

(7)    OSCAR ANDRADE

(8)    VICTOR VELAZQUEZ

(9)    DON MCNISH

## I.    BACKGROUND OF THE INVESTIGATION

### A.    Background of Confidential Sources

#### 1.    DEA CS-1

6.    A confidential source (hereinafter "CS-1"), has worked with the DEA since approximately 1999. In addition to providing funds for certain expenses, the DEA has paid CS-1 for his/her information and services. CS-1 has two prior arrests by the CPD for Criminal Trespass to a Vehicle and possession of a firearm without a valid FOID card, which charges were subsequently dismissed.[1]  CS-1 was deported from the United States in November 1997 and unlawfully reentered the country in January 1998. Because of CS-1's work with the DEA, CS-1 received status as a special parolee and is lawfully present in the United States. CS-1 has cooperated

---

[1]According to CPD documents, CS-1 was stopped for driving while talking on a cell phone. The CS-1 told officers that he was a DEA agent and produced a fake DEA identification badge, according to CPD. Subsequently other DEA paraphernalia and a firearm were recovered from CS-1's residence. I examined the seized firearm and determined it to be a "starter" pistol, similar to that used for athletic contests, loaded with blank rounds. According to the CPD, CS-1 produced the DEA badge to officers on one prior occasion.

in other investigations and is thought to be credible and reliable. Specifically, information provided by CS-1 has resulted in the identification, prosecution, and dismantling of multiple drug distributors who operated in the Chicago area. To date, information provided by CS-1 has resulted in the arrests of approximately fifteen individuals and the seizure of over $2,000,000 in U.S. currency and assets, 33 kilograms of cocaine, and one-half ton of cannabis. CS-1 has provided credible, reliable, and timely information to law enforcement officers since 1999. During that time, DEA agents have spoken to CS-1 in person and telephonically on numerous occasions. As described below, certain information provided by CS-1 regarding certain individuals engaged in the drug trafficking organization that is the subject of this affidavit has been corroborated by independently obtained evidence during the investigation.

### 2.    DEA CS-2

7.    A confidential source (hereinafter "CS-2") was a confidential source for the DEA between approximately June 2007 and on or about August 24, 2007. CS-2 was arrested after purchasing cocaine from SALVADOR GARCIA in June 2007. After his/her arrest, CS-2 agreed to cooperate and make controlled cocaine purchases from SALVADOR GARCIA. CS-2 cooperated in the hope he/she would not be charged for the cocaine purchase from SALVADOR GARCIA. CS-2 has no criminal history. After his/her arrest, CS-2 has provided credible, reliable, and timely information to law enforcement officers. Since that time, DEA agents have spoken to CS-2 in person or telephonically on multiple occasions. Certain information provided by CS-2 regarding SALVADOR GARCIA has been corroborated by independently obtained evidence during this investigation. No promises were made to CS-2 regarding whether he/she would be charged in connection with the June arrest. At this time DEA does not expect to seek the prosecution of CS-2

4

in connection with that arrest.

**B.    Certain Historical Information Provided by CS-1 and CS-2**

8.    On or about July 28, 2006, having been previously directed by agents to make contact with certain individuals, CS-1 informed agents that CS-1 had been introduced by "Pancholine" (whom CS-1 identified as FRANCISCO MENDEZ-NUNEZ based on driver's license records) to Individual A, a Columbian male and the head of a drug-trafficking organization that operated in Chicago. CS-1 related that during unrecorded conversations with other members of the organization they indicated to CS-1 that Individual A had placed FRANCISCO MENDEZ-NUNEZ in charge of day-to-day operations of the Chicago-based organization in the mid- to late-1990s. CS-1 also identified an individual known as "Chava" (whom CS-1 identified through driver's license photograph as SALVADOR GARCIA) as a drug trafficker in the organization, based on CS-1's interactions with and observations of SALVADOR GARCIA. CS-1 stated that "Chava" distributes narcotics for the organization and collects proceeds from narcotics sales. CS-1 related to agents that, at some point during the spring of 2006, SALVADOR GARCIA had provided CS-1 with cellular telephone number (773) 390-6007 (Target Phone 2) as a number that SALVADOR GARCIA used.

9.    On or about August 11, 2006, CS-1 informed agents that earlier that day CS-1 had accompanied SALVADOR GARCIA on a pick-up of approximately $70,000 in cash for FRANCISCO MENDEZ-NUNEZ, who in turn paid SALVADOR GARCIA approximately $1000 for the pick-up.

10.    On or about June 25, 2007, agents interviewed CS-2. CS-2 stated that he/she met SALVADOR GARCIA in approximately June 2007 at Raul's Bar, 3214 West 47th Street, Chicago. CS-2 stated he/she was introduced to SALVADOR GARCIA through an employee of Raul's Bar.

5

According to CS-2, he/she asked the employee if he knew of anyone who sold cocaine.  The employee then turned to SALVADOR GARCIA and introduced CS-2 to him.  At the time of the interview, CS-2 said that he/she has been purchasing personal use amounts of cocaine from SALVADOR GARCIA a couple of times every two or three weeks.  CS-2 stated that SALVADOR GARCIA had provided CS-2 his phone number (773) 390-6007 (Target Phone 2) after approximately three purchases.  CS-2 explained that he/she would call SALVADOR GARCIA on Target Phone 2 to order cocaine.

### C.    Title III Interception

11.    On August 13, 2007, Chief Judge James F. Holderman entered an Order authorizing the interception of wire communications to and from the cellular telephone bearing the number (773) 390-6007 (Target Phone 2) (the "8-13-07 Order").  There was no listed subscriber for Target Phone 2; however, based on surveillance, intercepted calls, and reporting from CS-1 and CS-2, the user of Target Phone 2 was SALVADOR GARCIA.[2]  The wire interception of Target Phone 2 began on August 14, 2007, at approximately 4:41 p.m., and continued until September 11, 2007.  On September 11, 2007, Chief Judge Holderman entered an Order authorizing the continued interception of wire communications to and from Target Phone 2 (the "9-11-07 Order").  The continued wire interception of Target Phone 2 pursuant to the 9-11-07 Order began on September 11, 2007 at approximately 4:46 p.m., and continued through October 10, 2007.

---

[2]This has been confirmed by CS-2 information, surveillance of the subject while utilizing Target Phone 2 and voice identification by Affiant based on listening to a surveilled meeting between SALVADOR GARCIA and CS-2 on July 12, 2007 and then comparing that voice to the voice on the telephone recordings. Surveillance was able to identify SALVADOR GARCIA through photographic identification. Additionally, during intercepted conversations over Target Phone 2 and Target Phone 3, SALVADOR GARCIA was referred to by nickname and first name on several occasions.

12.    On October 9, 2007, Chief Judge James F. Holderman entered an Order authorizing the interception of wire communications to and from cellular telephone (773) 315-0030 (Target Phone 3) for a period of thirty days (the "10-9-07 Order").  Based on subscriber information, interceptions, and surveillance, the user of Target Phone 3 was MENDEZ-NUNEZ.[3]  Agents conducted interceptions pursuant to the 10-9-07 Order from October 9, 2007 through November 7, 2007.  On November 8, 2007, Chief Judge James F. Holderman entered an Order authorizing the continued interception of wire communications to and from Target Phone 3 for a period of thirty days (the "11-8-07 Order").  Agents conducted interceptions pursuant to the 11-8-07 Order from November 8, 2007 through and including December 7, 2007.

## II.    SUMMARY OF INVESTIGATION

13.    This investigation has revealed that FRANCISCO MENDEZ-NUNEZ and others are significant participants in a drug trafficking conspiracy in Chicago, Illinois, and elsewhere.  The organization is involved in the distribution and delivery of quantities of cocaine to multiple customer, including those located throughout Illinois, northwest Indiana, and Virginia. The investigation has revealed that FRANCISCO MENDEZ-NUNEZ's organization is being supplied with cocaine by, among others, JUAN DURAN and JAVIER GARCIA, who was aided by

---

[3]The identification of FRANCISCO MENDEZ-NUNEZ has been confirmed by surveillance of the subject while utilizing Target Phone 3. For example on November 2, 2007 at approximately 2:16 p.m., surveillance observed MENDEZ-NUNEZ outside the Mi Segunda Bar talking on Target Phone 3 which was confirmed by Call Session #1220. Target Phone 3 is subscribed to FRANCISCO MENDEZ at 10424 S. Avenue L, Chicago, Illinois. The biographical information provided to AT & T by the subscriber such as date of birth, social security number and Illinois driver's license number all match Francisco MENDEZ-NUNEZ. Additionally, during prior phone calls over Target Phone 3, individuals such as JAVIER GARCIA referred to FRANCISCO MENDEZ-NUNEZ as "Pancho," which is the alias utilized by FRANCISCO MENDEZ-NUNEZ according to information provided by CS-1.

FRANCISCO SOTO. Their customers include drug users and those who purchase wholesale quantities of cocaine for distribution, including OSCAR ANDRADE, who purchased approximately two kilograms of cocaine from FRANCISCO MENDEZ-NUNEZ and distributed the cocaine to Individual K, and SALVADOR GARCIA, a retail distributor. The distributions occurred in public places, private residences, and various business establishments located in the Chicago and Summit, Illinois areas, including bars and restaurants. In addition, FRANCISCO MENDEZ-NUNEZ often used his own garage as a distribution point. FRANCISCO MENDEZ JR. a/k/a "PACO," the son of FRANCISCO MENDEZ-NUNEZ, coordinated drug deliveries when his father was absent, including by arranging distribution to DON MCNISH, a frequent customer of FRANCISCO MENDEZ-NUNEZ, and VICTOR VELAZQUEZ, who received from and distributed cocaine to co-conspirators. Meetings were oftentimes arranged during telephone conversations. During the investigation law enforcement seized approximately two kilograms of cocaine on or about July 16, 2007, approximately two kilograms of cocaine on or about October 31, 2007, and various smaller amounts of cocaine.

## III.    SUMMARY OF DEFENDANTS' ROLES IN THE CONSPIRACY

14.    The following is a brief summary of the roles each co-conspirator played in the conspiracy and the paragraphs in this affidavit pertaining to each:

(a)    FRANCISCO MENDEZ-NUNEZ a/k/a "PANCHOLINE" a/k/a "PANCHO": As described throughout this affidavit, Affiant believes FRANCISCO MENDEZ-NUNEZ operated a cocaine distribution organization (the "organization") in the Chicago, Illinois, area. FRANCISCO MENDEZ-NUNEZ's distribution organization distributed kilogram quantities of cocaine to various individuals in the Illinois, Indiana, and Virginia areas. During the investigation, FRANCISCO

MENDEZ-NUNEZ delivered cocaine and collected drug proceeds by meeting customers at his residence, public places, and various businesses. In addition, FRANCISCO MENDEZ-NUNEZ directed individuals, including his son FRANCISCO MENDEZ JR., SALVADOR GARCIA, and others to distribute narcotics, collect narcotics proceeds, and send narcotics proceeds to Mexico. (See paragraphs 8-9, 12, 15-28, 31-36, 47-71, 83-86, 88-89, 91-95, 97-98.)

(b)    SALVADOR GARCIA a/k/a "CHAVA": Affiant believes SALVADOR GARCIA assisted FRANCISCO MENDEZ-NUNEZ by delivering drugs to the organization's customers, collected drug proceeds for FRANCISCO MENDEZ-NUNEZ, and sent money to Mexico for FRANCISCO MENDEZ-NUNEZ. In addition to assisting FRANCISCO MENDEZ-NUNEZ, SALVADOR GARCIA served a large network of both wholesale and personal use drug customers in the Chicago area. Agents frequently observed SALVADOR GARCIA visit multiple bars and restaurants in the Chicago and Summit, Illinois areas, where he would distribute personal use and wholesale amounts of drugs to various customers inside and in the vicinity of the establishments. SALVADOR GARCIA was also observed on multiple occasions making deliveries of unknown amounts of drugs to customers' residences. (See paragraphs 7-11, 37-46, 72-88, 90-96.)

(c)    FRANCISCO MENDEZ JR. a/k/a "PACO": Affiant believes FRANCISCO MENDEZ JR. assisted his father FRANCISCO MENDEZ-NUNEZ by distributing drugs and collecting drug proceeds while FRANCISCO MENDEZ-NUNEZ was in Mexico. Also FRANCISCO MENDEZ JR. aided FRANCISCO MENDEZ-NUNEZ by purchasing drugs from FRANCISCO MENDEZ-NUNEZ's cocaine suppliers for distribution. For example, while FRANCISCO MENDEZ-NUNEZ was in Mexico, FRANCISCO MENDEZ-NUNEZ made arrangements for FRANCISCO MENDEZ JR. to purchase approximately two kilograms of cocaine

9

from JAVIER GARCIA, one of FRANCISCO MENDEZ-NUNEZ's suppliers. (See paragraphs 47, 53-55, 60-61, 88-89, 94-95, 98.)

(d)     JAVIER GARCIA ("JAVI"): Affiant     believes     JAVIER GARCIA supplied FRANCISCO MENDEZ-NUNEZ's organization with wholesale amounts of cocaine which were then re-distributed by the organization for profit. In addition, your Affiant believes when FRANCISCO MENDEZ-NUNEZ was absent, JAVIER GARCIA distributed to FRANCISCO MENDEZ-NUNEZ's distributors. For example, based on intercepted phone calls, surveillance, and an ounce cocaine seizure from SALVADOR GARCIA, your Affiant believes JAVIER GARCIA, and his brother-in-law FRANCISCO SOTO, supplied cocaine to SALVADOR GARCIA while FRANCISCO MENDEZ-NUNEZ was in Mexico. (See paragraphs 37-38, 40, 47-52.)

(e)     FRANCISCO SOTO:  Affiant believes FRANCISCO SOTO assisted JAVIER GARCIA, his brother in-law, by distributing drugs and collecting drug proceeds. On occasion, FRANCISCO SOTO provided cocaine to SALVADOR GARCIA at the direction of JAVIER GARCIA. Intercepted calls demonstrate SALVADOR GARCIA would travel to FRANCISCO SOTO's residence to purchase cocaine.  SALVADOR GARCIA then distributed the cocaine to various customers of the organization. (See paragraphs 13, 38-46, 49, 52.)

(f)     JUAN DURAN a/k/a "JUAN DURAN-PADILLA" a/k/a "JUANILLO": Affiant believes that JUAN DURAN supplied FRANCISCO MENDEZ-NUNEZ with wholesale amounts of cocaine. On or about October 30, 2007, for example, FRANCISCO MENDEZ-NUNEZ obtained two kilograms of cocaine from JUAN DURAN, which cocaine FRANCISCO MENDEZ-NUNEZ then sold to OSCAR ANDRADE, who in turn distributed the cocaine to Individual K in southern Illinois.  (See paragraphs 22, 26, 31-36.)

10

(g)  OSCAR ANDRADE: Affiant believes that OSCAR ANDRADE distributed cocaine as part of the organization. FRANCISCO MENDEZ-NUNEZ supplied OSCAR ANDRADE with wholesale amounts of cocaine. For example, on one occasion during the investigation, OSCAR ANDRADE purchased approximately two kilograms of cocaine from FRANCISCO MENDEZ-NUNEZ and thereafter distributed that cocaine to Individual K in southern Illinois. (See paragraphs 17-21, 24, 28, 29, 30.)

(h)  VICTOR VELAZQUEZ: Affiant believes VICTOR VELAZQUEZ obtained cocaine from FRANCISCO MENDEZ-NUNEZ and FRANCISCO MENDEZ JR. on multiple occasions and distributed the cocaine to customers. In addition, VICTOR VELAZQUEZ distributed cocaine to SALVADOR GARCIA on multiple occasions.  On some occasions, FRANCISCO MENDEZ-NUNEZ fronted the cocaine to VICTOR VELAZQUEZ, meaning he would repay FRANCISCO MENDEZ-NUNEZ for the drugs after he resold them to customers. (See paragraphs 55, 63-75.)

(i)  DON MCNISH:  Affiant believes DON MCNISH purchased resale amounts of cocaine from FRANCISCO MENDEZ-NUNEZ and FRANCISCO MENDEZ JR. and thereafter distributed that cocaine for profit to other individuals. On at least some occasions, FRANCISCO MENDEZ-NUNEZ fronted the cocaine to DON MCNISH, meaning he would repay FRANCISCO MENDEZ-NUNEZ for the drugs after he resold them to customers. Further, your Affiant believes based on intercepted phone calls that DON MCNISH owes a significant drug debt to FRANCISCO MENDEZ-NUNEZ, which DON MCNISH has been trying to repay throughout much of the investigation. (See paragraphs 54-62.)

**IV.    PROBABLE CAUSE**

11

### A.    Two Kilogram Cocaine Seizure Relating to MENDEZ-NUNEZ

15.    As part of a separate investigation, the FBI in Virginia conducted a drug trafficking investigation that involved a subject traveling to Chicago to obtain wholesale quantities of cocaine, according to an FBI agent with knowledge of the matter. That investigation, which involved a judicially authorized wiretap on a phone used by Individual B, developed evidence that Individual B sent his brother, Individual C, to Chicago during Memorial Day weekend 2007 to purchase cocaine. GPS data revealed that one of Individual B's vehicles traveled to the vicinity of 10982 South Ave. N. in Chicago and stayed in Chicago for approximately two hours. During the trip, Individual C contacted a Chicago number used by Individual D that, in turn, had been in contact with a phone subscribed to FRANCISCO MENDEZ-NUNEZ on May 13 and May 14, 2007.

16.    On or about July 13, 2007, FBI agents from Virginia notified DEA Chicago that based on intercepted calls between Individual B and Individual D, they believed that Individual B intended to travel to Chicago to purchase two kilograms of cocaine from Individual D. On or about July 14, 2007, agents observed Individual B and Individual I meet and relocate to Individual I's residence at 10954 S. Avenue N in Chicago, where Individual B removed his vehicle's battery. On or about July 15, 2007, agents observed Individual B put his vehicle's battery back into place; travel with Individual D to the residence of FRANCISCO MENDEZ-NUNEZ at 10424 S. Avenue L, Chicago, Illinois;[4] Individual D walk up to FRANCISCO MENDEZ-NUNEZ's residence carrying a plastic bag; Individual D speak with FRANCISCO MENDEZ-NUNEZ in the rear of the residence; and Individual D leave the residence and enter his vehicle without the plastic bag. Agents observed

---

[4]As described below at Section VI, agents confirmed the residence of MENDEZ-NUNEZ by physical surveillance, public records, and subscriber information.

Individual B wait inside Individual D's vehicle while Individual D met with FRANCISCO MENDEZ-NUNEZ. The same afternoon, agents observed Individual B and Individual D travel to FRANCISCO MENDEZ-NUNEZ'S residence where the two met with FRANCISCO MENDEZ-NUNEZ in the rear of the residence. On or about July 16, 2007, Individual B was arrested by FBI Virginia upon returning to the Virginia area from Chicago. A search of Individual B's vehicle by agents revealed approximately two kilograms of cocaine concealed inside a false battery contained inside the vehicle.

**B.    Seizure of Approximately 2 Kilograms of Cocaine Relating to FRANCISCO MENDEZ-NUNEZ, JUAN DURAN, OSCAR ANDRADE, and Individual K**

17.    On October 27, 2007, at approximately 11:31 a.m. (Call Session 1058), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to OSCAR ANDRADE.[5] During the conversation, OSCAR ANDRADE stated, "No, no. Well, I'm going to get out around 4:00 p.m. today, so, so that I can go talk with you."[6] FRANCISCO MENDEZ-NUNEZ replied, "Uh-huh."

---

[5] The identification of OSCAR ANDRADE is based, in part, upon the following. On October 30, 2007, FRANCISCO MENDEZ-NUNEZ placed a call to a prepaid cellular telephone number believed to be being used by OSCAR ANDRADE and subscribed to a fictitious name. During the call, ANDRADE told MENDEZ-NUNEZ to come to his house. Agents then followed MENDEZ-NUNEZ to 4753 S. Avers, Chicago, Illinois. A utility check on the residence indicated OSCAR ANDRADE resides at the address. Shortly after FRANCISCO MENDEZ-NUNEZ departed and OSCAR ANDRADE, who was also identified based upon a photograph corresponding to an Illinois driver's license, was observed leaving the residence in a Nissan Altima registered in his name.

[6] Times provided for the intercepted communications summarized below are approximate. The summaries do not include references to every topic discussed during an intercepted conversation, nor do the summaries include every statement made by a speaker about the topics discussed. Several of these conversations were in the Spanish language, and language analysts have provided preliminary transcripts or summaries of these conversations in English. My understanding and interpretation of these conversations is denoted by square brackets and is based on my knowledge of the investigation to date, the context of the conversations (both

OSCAR ANDRADE then said, "They called me last week, and they're ready." [OSCAR ANDRADE wanted to purchase cocaine from FRANCISCO MENDEZ-NUNEZ for other individuals.] FRANCISCO MENDEZ-NUNEZ said, "All right, then."

18.    On October 27, 2007, at approximately 4:45 p.m. (Call Session 1073), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to OSCAR ANDRADE. During the conversation, FRANCISCO MENDEZ-NUNEZ asked OSCAR ANDRADE, "Did you need a ticket...some tickets...tickets for the dance or what? [MENDEZ-NUNEZ asked ANDRADE if he wanted an amount of cocaine.] OSCAR ANDRADE replied, "Yes, I need two." [Two kilograms of cocaine.] FRANCISCO MENDEZ-NUNEZ then said, "Okay, call me once you get to your house." OSCAR ANDRADE said, "Okay, I'll wait for you. Right by my house..." FRANCISCO MENDEZ-NUNEZ said, "No! Call me when you get there."

19.    On October 27, 2007, at approximately 5:07 p.m., (Call Session 1074), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from OSCAR ANDRADE. During the conversation, OSCAR ANDRADE said, "I'm here at home already." FRANCISCO MENDEZ-NUNEZ said, "Well, at what time you get in at work in the morning?" OSCAR ANDRADE said, "No, I don't work tomorrow." FRANCISCO MENDEZ-NUNEZ then stated, "No...then tomorrow in the morning instead...Because there's a party!" OSCAR ANDRADE replied, "Okay." FRANCISCO MENDEZ-NUNEZ said, "Anyway, look: It'll be better early in the morning. Anyhow everything is all ready..." OSCAR ANDRADE said, "Okay...It's because I

---

standing alone and in reference to prior and subsequent conversations, and in the context of the investigation as a whole), my training and experience, conversations I have had with other agents and officers experienced in narcotics investigations, and on information provided by CS-1 and CS-2.

wanted ...I wanted to go tomorrow." FRANCISCO MENDEZ-NUNEZ said, "I'll give you a call early and shit. Maybe I'll..." OSCAR ANDRADE said, "Okay."

20.    On October 29, 2007, at approximately 12:40 p.m., (Call Session 1106), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to OSCAR ANDRADE. During the conversation, OSCAR ANDRADE told FRANCISCO MENDEZ-NUNEZ, "I'll call you early, tomorrow." MENDEZ-NUNEZ said, "All right."

21.    On October 30, 2007, at approximately 7:45 a.m., agents established surveillance on FRANCISCO MENDEZ-NUNEZ's residence at 10424 South Avenue L in an effort to observe a meeting between FRANCISCO MENDEZ-NUNEZ and OSCAR ANDRADE.

22.    At approximately 9:44 a.m., (Call Session 1137), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to JUAN DURAN at telephone number (773) 401-3589.[7] During the conversation, FRANCISCO MENDEZ-NUNEZ asked JUAN DURAN, "Did you go to break already?"  JUAN DURAN replied, "...just working hard, not yet but..." FRANCISCO MENDEZ-NUNEZ said, "What time are you coming out?" JUAN DURAN said, "...in about ten to twelve minutes, I think." FRANCISCO MENDEZ-NUNEZ said, "Oh, not sure if I'll get there on time." JUAN DURAN said, "Huh." FRANCISCO MENDEZ-NUNEZ then said, "Leave them for me, remember how I told you?" [MENDEZ-NUNEZ told DURAN to leave the kilograms of cocaine in the spot where MENDEZ-NUNEZ told him to.] JUAN DURAN replied, "Okay. That's fine. I'll leave it there [U/I]..."

---

[7] The telephone's voicemail indicated that the phone belonged to JUAN DURAN, though no subscriber was listed. In addition based on intercepted phone calls and surveillance, as described below in paragraph 33, agents observed FRANCISCO MENDEZ-NUNEZ meeting with JUAN DURAN, who was video recorded and identified by surveillance agents based on an Illinois driver's license photograph, after the two arranged to meet over the phone.

23.     At approximately 9:45 a.m., agents observed FRANCISCO MENDEZ-NUNEZ and an unknown Hispanic male leave FRANCISCO MENDEZ-NUNEZ's residence in MENDEZ-NUNEZ's green Dodge Ram pick-up truck.

24.     At approximately 9:54 a.m. (Call Session 1139), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to OSCAR ANDRADE. During the conversation, FRANCISCO MENDEZ-NUNEZ said, "Yeah, I'm on my way." OSCAR ANDRADE replied, "Nothing, I'm just here." FRANCISCO MENDEZ-NUNEZ said, "Huh?" OSCAR ANDRADE then said, "Here at home." FRANCISCO MENDEZ-NUNEZ replied, "So should we meet there, or where else?" OSCAR ANDRADE said, "I'm here at home, I want to show you something." FRANCISCO MENDEZ-NUNEZ said, "Huh?" OSCAR ANDRADE said, "Come to my house, I want to show you something."

25.     At approximately 10:08 a.m., agents observed FRANCISCO MENDEZ-NUNEZ and an unknown male arrive in FRANCISCO MENDEZ-NUNEZ's green Dodge Ram pick-up at Edsal Manufacturing, 4400 S. Packer Street, Chicago, Illinois. Surveillance agents observed FRANCISCO MENDEZ-NUNEZ exit the green Dodge empty handed and walk between several parked vehicles out of sight of agents.

26.     At approximately 10:09 a.m., (Call Session 1140), MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to JUAN DURAN. During the conversation, FRANCISCO MENDEZ-NUNEZ said, "Oh, what the fuck!" JUAN DURAN said, "Hello." FRANCISCO MENDEZ-NUNEZ said, "Your car alarm was going off." JUAN DURAN said, "Yeah." FRANCISCO MENDEZ-NUNEZ said, "The car alarm was going off." DURAN said, "Oh, yeah? And did it stop yet." MENDEZ-NUNEZ replied, "The shit just stopped." JUAN DURAN said, "Lock

16

it up, and I'll go by right now." FRANCISCO MENDEZ-NUNEZ said, "All right, then."

27.     At approximately 10:11 a.m., surveillance agents observed FRANCISCO MENDEZ-NUNEZ, who had his hands in his jacket pockets, walk back to and reenter the pick-up and leave the area. Agents then followed FRANCISCO MENDEZ-NUNEZ

28.     At approximately 10:23 a.m., agents observed FRANCISCO MENDEZ-NUNEZ arrive at 4753 S. Avers Street, Chicago, Illinois. A Lexis Nexis search on this address showed that OSCAR ANDRADE resided at 4753 S. Avers Street. After arriving, agents observed FRANCISCO MENDEZ-NUNEZ exit his pick-up carrying a black bag and walk toward the rear entrance of 4753 S. Avers. A short time later, FRANCISCO MENDEZ-NUNEZ was observed walking away from the rear of the residence empty handed.

29.     At approximately 9:23 p.m., agents observed OSCAR ANDRADE exit the residence carrying a white plastic bag and enter a black Nissan Murano bearing Illinois license plates G965517. Shortly thereafter, an unknown Hispanic female (UHF) entered the Nissan Murano and the two departed the area. Agents followed OSCAR ANDRADE and the UHF to a Jewel grocery store located near the intersection of Pulaski and 54th streets in Chicago, Illinois. At approximately 9:48 p.m., agents observed OSCAR ANDRADE discard a white plastic bag into a garbage can located on the north side of the Jewel grocery store.  After following OSCAR ANDRADE home, agents returned to the garbage can and retrieved the plastic bag OSCAR ANDRADE discarded. After opening the plastic bag, agents discovered, based on experience and training, what appeared to be two kilogram cocaine wrappers further contained in two pieces of black rubber.

30.     On October 31, 2007, at approximately 12:00 p.m., agents observed OSCAR ANDRADE depart his residence driving a red Nissan Altima bearing Illinois license plates 4970012

and continued to follow OSCAR ANDRADE. At approximately 3:05 p.m., agents observed OSCAR ANDRADE pick up a male later identified as Individual K in front of a Menard's store located at 900 Greenbriar Drive, Normal, Illinois. At that time, OSCAR ANDRADE and Individual K relocated across the street to a Sam's Club. At approximately 3:08 p.m., agents observed Individual K exit OSCAR ANDRADE's red Nissan and open the trunk and remove a bag with white handles. At that time, OSCAR ANDRADE immediately left the area and Individual K entered a Ford Explorer with the bag he retrieved from OSCAR ANDRADE's vehicle. At approximately 3:26 p.m., agents observed Individual K commit various traffic violations and initiated a traffic stop. During the traffic stop, Individual K, who identified himself to officers, verbally consented to a search of his vehicle. During the search of his vehicle, agents discovered a bag containing what appeared to be two kilograms of cocaine. An agent, posing as a corrupt officer, seized the two kilograms of cocaine, apparently without Individual K's knowledge. At the time of the stop, agents also seized approximately $2,516 in cash from Individual K. At the time of the seizure, Individual K was not arrested, in order to protect the investigation. Individual K is not cooperating with the investigation at this time.

C.    **Other Cocaine Transactions Involving FRANCISCO MENDEZ-NUNEZ and JUAN DURAN**

31.    In addition to the seizure described above, the phone calls listed below demonstrate that FRANCISCO MENDEZ-NUNEZ has purchased cocaine from JUAN DURAN on other occasions. Throughout the course of the investigation, agents observed FRANCISCO MENDEZ-NUNEZ travel to JUAN DURAN's place of employment located at Edsal Manufacturing, 4400 S. Packer Street, Chicago, Illinois, where he would briefly meet with JUAN DURAN on his

breaks from work.

32.     On November 1, 2007, at approximately 12:09 p.m., (Call Session 1202), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to JUAN DURAN at telephone number (773) 401-3589. During the call, FRANCISCO MENDEZ-NUNEZ asked JUAN DURAN, "So what do you think man? How are they? So I can come by." ["They" refers to drugs.] JUAN DURAN said, "Huh?" FRANCISCO MENDEZ-NUNEZ stated, "If not, I'll see you tomorrow in the morning. I'll go by tomorrow to see you." JUAN DURAN said, "Yes, if you have a chance, stop by. To see what comes out of it." FRANCISCO MENDEZ-NUNEZ said, "All right, then."

33.     On November 2, 2007, at approximately 11:59 p.m., (Call Session 1214), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to JUAN DURAN at telephone number (773) 401-3589. During the conversation, JUAN DURAN said, "Well we'll be coming out in a few minutes..." FRANCISCO MENDEZ-NUNEZ said, "Huh?" JUAN DURAN replied, "I said, I said, we'll do it there, in a few minutes, [U/I]." [DURAN told MENDEZ-NUNEZ that they would conduct their narcotics transaction in a few minutes.] Subsequent to the above mentioned call, surveillance agents observed FRANCISCO MENDEZ-NUNEZ and JUAN DURAN meet at Edsal Manufacturing, 4400 S. Packer Street in Chicago. During the above mentioned meeting, agents video recorded FRANCISCO MENDEZ-NUNEZ removing what appeared to be a small bag from his green Dodge pick-up truck. Due to the positioning of FRANCISCO MENDEZ-NUNEZ's vehicle, agents did not see where FRANCISCO MENDEZ-NUNEZ placed the bag after removing it from his truck.

34.     On November 5, 2007, at approximately 11:27 a.m., (Call Session 1265), FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to JUAN DURAN.

During the call, FRANCISCO MENDEZ-NUNEZ said, "Well...I'll stop by when you guys go to lunch." JUAN DURAN said, "Yeah. No, if you can, if you have time that's fine. We'll see what's up, in the next few minutes." FRANCISCO MENDEZ-NUNEZ then said, "Are you okay?" JUAN DURAN replied, "Well no, not so much. I was waiting for my friend, over here...to see, to see if I see him right now, to see if that other guy called him from that other...to see if he went to work, to see what's up. To see if he worked the weekend or not, however. If there was nothing done, it gives a chance [U/I]. Want to see how he's doing. I haven't seen him yet." [DURAN told MENDEZ-NUNEZ that he has not spoken with his friend to see if the friend received any drugs.] FRANCISCO MENDEZ-NUNEZ said, "Oh." JUAN DURAN said, "Yeah." FRANCISCO MENDEZ-NUNEZ stated, "All right then, [U/I] later." DURAN said, "It's possibly he did. Okay." [DURAN said it is possible his friend did receive some drugs.]

35.    On November 6, 2007, at approximately 1:48 p.m., (Call Session 1312) FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to JUAN DURAN. During the conversation, FRANCISCO MENDEZ-NUNEZ asked, "What do you have that's good?" [MENDEZ-NUNEZ asked if there were any drugs available.] JUAN DURAN replied, "Oh, yesterday we forgot to call you, it got late, and that asshole didn't check in right away." FRANCISCO MENDEZ-NUNEZ said, "Oh." JUAN DURAN said, "And no, well then..." FRANCISCO MENDEZ-NUNEZ asked, "And today, either?" [MENDEZ-NUNEZ asked if he had any drugs today.] JUAN DURAN said, "That's its cold, just real cold." [DURAN said he does not have any drugs.] FRANCISCO MENDEZ-NUNEZ said, "It's cold right?" JUAN DURAN said, "Well, yeah stop by...it seems that my buddy has a little bottle. Not sure if he finished it, or if he was going to invite us or not." [DURAN told MENDEZ-NUNEZ that his buddy may be able to supply him drugs.]

36.    On November 19, 2007, at approximately 12:19 p.m., (Call Session 1567) FRANCISCO MENDEZ-NUNEZ, using Target Phone 3, placed an outgoing call to JUAN DURAN. During the call, FRANCISCO MENDEZ-NUNEZ said, "Everything calm?" JUAN DURAN said, "Yeah." FRANCISCO MENDEZ-NUNEZ said, "Nothing, I was just calling to see if you had "tacos." [An amount of drugs.] JUAN DURAN said, "Yeah. Right now, almost, nothing. Since I haven't worked a lot." FRANCISCO MENDEZ-NUNEZ said, "Okay." JUAN DURAN further explained, "My friend over here, took some [stutters] on vacation, and my other guy also went out, so we're just here working only the 40 hours and that's it." [DURAN told MENDEZ-NUNEZ that he does not have any drugs and that he was currently only working at his normal job.] JUAN DURAN went on and said, "Maybe in a few days. Anyway, sometime this week." [DURAN is expecting to get some more drugs this week.] FRANCISCO MENDEZ-NUNEZ said, "All right, then." JUAN DURAN said, "Yeah, anyway right now, there's very little, no big deal." [DURAN explained he has a small amount of drugs.] FRANCISCO MENDEZ-NUNEZ said, "The day after tomorrow...?" JUAN DURAN said, "Yeah. Before Thanksgiving..."

**D.    Cocaine Transactions Involving JAVIER GARCIA, SALVADOR GARCIA, FRANCISCO SOTO, FRANCISCO MENDEZ-NUNEZ, and FRANCISCO MENDEZ JR.**

**1.    Cocaine Seizure on September 18, 2007**

37.    On or about September 18, 2007, at approximately 12:39 p.m., (Call Session 1817), SALVADOR GARCIA received an incoming call on Target Phone 2 from JAVIER GARCIA,[8] who

---

[8]On October 27, 2007, at approximately 4:12 p.m., (Call Session #1071), FRANCISCO MENDEZ-NUNEZ received an incoming call from JAVIER GARCIA on Target Phone 3. During the call MENDEZ-NUNEZ told GARCIA he would stop by his house in approximately

was using telephone number 773-948-0675, a T-Mobile prepaid phone subscribed to an unknown individual. During the conversation JAVIERGARCIA asked SALVADOR GARCIA, "What was I going to tell you? Ah, did you need one or what?" [JAVIER GARCIA asked SALVADOR GARCIA if he wanted an amount of cocaine.] SALVADOR GARCIA replied, "Yes!" JAVIER GARCIA then said, "Okay, but ah my brother-in-law has them but he is working right now. I will give him your phone number so that he can call you when he gets out." [JAVIER GARCIA told SALVADOR GARCIA that his brother-in-law, FRANCISCO SOTO, had the cocaine.] SALVADOR GARCIA then said, "All right, but [stutters] like I was telling you I would pay you about 7:00." [SALVADOR GARCIA is telling JAVIER GARCIA he will pay him at 7:00 for the cocaine.] JAVIER GARCIA said, "Okay, that's fine bro."

38.    On September 18, 2007, at approximately 3:58 p.m., (Call Session #1825), SALVADOR GARCIA placed an outgoing call on Target Phone 2 to JAVIER GARCIA who was using telephone number (773) 948-0675. During the call, SALVADOR GARCIA asked, "Did you talk to him already? [SALVADOR GARCIA was referring to JAVIER GARCIA's brother-in-law, FRANCISCO SOTO.] JAVIER GARCIA replied, "He should be calling you in a few minutes." SALVADOR GARCIA said, "All right. I will call you about 7:30 so that I can take you the money." [SALVADOR GARCIA told JAVIER GARCIA he would call him in order to pay for the narcotics

---

10 minutes. At approximately 4:51 p.m., MENDEZ-NUNEZ was observed by surveillance arriving at 3706 S. Paulina, Chicago, Illinois. A utility check conducted on 3706 S. Paulina indicated JAVIER GARCIA was paying the utility bill. In addition, your Affiant has observed JAVIER GARCIA, identified through an Illinois driver's license photograph, entering and exiting the residence on multiple occasions. Based on a Lexis Nexis search, FRANCISCO SOTO is married to JAVIER GARCIA's sister. In an intercepted call, JAVIER GARCIA told SALVADOR GARCIA his "brother-in-law" would be calling SALVADOR GARCIA. A few moments later, SALVADOR GARCIA received a call from FRANCISCO SOTO, who identified himself as "Javi's brother-in-law."

he was going to pick up from JAVIER GARCIA's brother- in-law, FRANCISCO SOTO.] JAVIER

GARCIA replied, "Okay, I will call you when I get out of school. I get out at 8:00." At that point in

the conversation, SALVADOR GARCIA received an incoming call on the call waiting feature of

Target Phone 2 from FRANCISCO SOTO, who was using telephone number (773) 780-7909.[9]

During the conversation FRANCISCO SOTO told SALVADOR GARCIA, "It's Javi's

brother-in-law." SALVADOR GARCIA said, "Oh, I just hung up with him. Where are you?"

FRANCISCO SOTO replied, "Oh, I'm here just getting off of work, but I'm headed home."

SALVADOR GARCIA then said, "If you want, if you want, I'll go by your house because I'm here

on 47th and Kedzie." FRANCISCO SOTO acknowledged and said, "It's 2846 West 39th Place, right

here off of California."

39.    At that point, agents initiated surveillance on 2846 West 39th Place and observed

SALVADOR GARCIA arrive at the residence. Agents observed SALVADOR GARCIA meet with

FRANCISCO SOTO and both subsequently entered the 2846 West 39th Place residence. A short time

later, agents observed SALVADOR GARCIA exit the residence with his hand in his left front pants

pocket. Agents later observed SALVADOR GARCIA traveling at a high rate of speed and initiated

a traffic stop. During a protective pat down, one of the officers asked SALVADOR GARCIA what

was in his left front pants pocket and SALVADOR GARCIA replied, "Tengo drogas Official." [I have

---

[9]During the above mentioned call (Call #1825) FRANCISCO SOTO provided SALVADOR
GARCIA with his address 2846 West 39th Place, Chicago, Illinois, and arranged to meet
SALVADOR GARCIA when he returned home. A short time after the above mentioned call,
surveillance observed FRANCISCO SOTO meet with SALVADOR GARCIA outside the 2846
West 39th Place residence.  A utility check on the address revealed FRANCISCO SOTO resides
at 2846 West 39th Place. In addition, surveillance agents have observed FRANCISCO SOTO,
identified through an Illinois driver's license photograph, entering and exiting the residence on
multiple occasions.

drugs officer.] The officer then recovered a large plastic baggie containing a white powdery substance along with eight individually packaged clear knotted plastic bags containing a white powdery substance. Additional baggies were recovered from SALVADOR GARCIA's sock and right front pocket. (The bags were later submitted for laboratory analysis and the white substance was determined to be approximately 33.5 grams of cocaine.) While speaking with SALVADOR GARCIA, the officers asked who his source of supply was. He said his source of supply was "out of the country on vacation." Due to the ongoing investigation, the officers who initiated the traffic stop posed as corrupt officers, related to SALVADOR GARCIA that the officers would keep the cocaine, and allowed SALVADOR GARCIA to depart.

40.    On or about September 19, 2007, at approximately 8:51 p.m. (Call Session 1881), SALVADOR GARCIA placed an outgoing call using Target Phone 2 to JAVIER GARCIA. During the conversation, SALVADOR GARCIA asked, "How should we do this?" [SALVADOR GARCIA asked JAVIER GARCIA where they should meet so SALVADOR GARCIA could pay him for the cocaine he purchased from FRANCISCO SOTO the previous day.] JAVIER GARCIA replied, "Over here on Archer and Kostner." At approximately 9:16 p.m., (Call Session 1884) SALVADOR GARCIA received an incoming call on Target Phone 2 from JAVIER GARCIA. During the call, SALVADOR GARCIA asked JAVIER GARCIA, "Are you almost here?" JAVIER GARCIA replied, "I am on Archer and ah…[stutters] passing California." SALVADOR GARCIA then said, "All right." JAVIER GARCIA stated, "I see you right now. I'll wait for you there."

## 2.    Other Interceptions Relating to SALVADOR GARCIA Purchasing Cocaine from FRANCISCO SOTO

41.    On September 20, 2007, at approximately 4:19 p.m., (Call Session 1905),

SALVADOR GARCIA received an incoming call on Target Phone 2 from FRANCISCO SOTO. During the call, FRANCISCO SOTO said, "This is Javi's brother-in-law." SALVADOR GARCIA said, "What's going on?" FRANCISCO SOTO then asked, "Were you needing something?" [SOTO asked S. GARCIA if he needed an amount of drugs.] SALVADOR GARCIA replied, "Yeah, but uh...where, where are you at, now?" FRANCISCO SOTO said, "Right now, I'm passing by uh, by uh La Segunda." SALVADOR GARCIA said, "So, do you have something there or not?" [S. GARCIA asked SOTO if he had drugs with him.] FRANCISCO SOTO said, "Yeah." SALVADOR GARCIA said, "Okay. So then, why don't you wait for me there at La Segunda."

42.    On September 24, 2007, at approximately 7:36 p.m., (Call Session 2155) SALVADOR GARCIA received an incoming call on Target Phone 2 from FRANCISCO SOTO. During the call FRANCISCO SOTO said, "What's up Chavita?" SALVADOR GARCIA said, "Where are you?" FRANCISCO SOTO replied, "Just getting home." SALVADOR GARCIA asked, "Do you want me to go over there or not?" [SALVADOR GARCIA asked FRANCISCO SOTO if he could come over to purchase drugs.] FRANCISCO SOTO said, "Yeah, if you can" SALVADOR GARCIA then said, "All right, I'll be there in five, ten minutes."FRANCISCO SOTO replied, "All right."

43.    On September 29, 2007, at approximately 3:24 p.m., (Call Session 2355) SALVADOR GARCIA received an incoming call on Target Phone 2 from FRANCISCO SOTO. During the call, FRANCISCO SOTO said, "What's going on, Chavita?" SALVADOR GARCIA asked, "Where are you?" FRANCISCO SOTO said, I'm here...I'm around La Segunda." SALVADOR GARCIA later said, "Okay, so I'll call you later, so I can stop by your house." At approximately 5:38 p.m., (Call Session 2360) SALVADOR GARCIA made an outgoing call on Target Phone 2 to FRANCISCO SOTO. During the conversation, SALVADOR GARCIA asked, "Are you at home?" FRANCISCO

SOTO said, "Yeah, I'm barely getting there. In about 15 minutes. Why, what happened?" SALVADOR GARCIA said, "No, it's because I'm here by 55th and Racine. I'll be on my way over there now." FRANCISCO SOTO replied, "All right, man."

44.    On October 4, 2007, at approximately 3:44 p.m., (Call Session 2622), SALVADOR GARCIA made an outgoing call on Target Phone 2 to FRANCISCO SOTO. During the call FRANCISCO SOTO said, "What's going on Chavita? What's up?" SALVADOR GARCIA said, "Ah, are you going to be at the house later on?" [GARCIA asked SOTO if he was going to be home later so SALVADOR GARCIA could purchase drugs.] FRANCISCO SOTO replied, "Ah...right now..ah, what time?" SALVADOR GARCIA said, "Around 6:00." FRANCISCO SOTO said, "I'm going to be at the park but call me I'll wait for you somewhere." SALVADOR GARCIA said, "All right."

45.    On October 6, 2007, at approximately 3:44 p.m., (Call Session 2739), SALVADOR GARCIA placed an outgoing call using Target Phone 2 to SOTO. During the call, FRANCISCO SOTO said, "What's up Chavita?" SALVADOR GARCIA said, "Whats up?" FRANCISCO SOTO said, "It's not here yet!" [SOTO told SALVADOR GARCIA he did not have the drugs yet.] SALVADOR GARCIA said, "What?" FRANCISCO SOTO said, "Not yet!" SALVADOR GARCIA said, "Oh, what the fuck!" FRANCISCO SOTO said, "I'll call you. They say tonight but if not tomorrow."

46.    On October 10, 2007, at approximately 4:06 p.m., (Call Session 2947), SALVADOR GARCIA received an incoming call on Target Phone 2 from FRANCISCO SOTO. During the conversation, FRANCISCO SOTO told SALVADOR GARCIA, "Just here calling you to tell you that I'm ready." [SOTO told GARCIA he had drugs available.] SALVADOR GARCIA said, "You're ready?" FRANCISCO SOTO said, "Yeah, whenever you want." SALVADOR GARCIA said, "Where

26

are you now?" FRANCISCO SOTO said, "I'm getting to my house." SALVADOR GARCIA said, "I am over here on fifty-eighth and Western" FRANCISCO SOTO said, "If you want I will wait for you by La Segunda or something?" SALVADOR GARCIA said, "How is that shit?" [S. GARCIA asked SOTO about the quality of the drugs.] FRANCISCO SOTO said, "They're good! They're good this time!" SALVADOR GARCIA said, "So then you call me when you are around?" FRANCISCO SOTO said, "All right." At approximately 4:56 p.m., (Call Session 2949), SALVADOR GARCIA received an incoming call on Target Phone 2 from FRANCISCO SOTO. During the call, FRANCISCO SOTO said, "What's up, Chavita?" Where are you at?" SALVADOR GARCIA said, "I'm here at "La Segunda." FRANCISCO SOTO said, "I'm on my way over there." SALVADOR GARCIA replied, "All right. I'll wait for you here."

### 3. Other Interceptions Relating to JAVIER GARCIA Supplying Cocaine to FRANCISCO MENDEZ-NUNEZ and Explaining Roles of FRANCISCO MENDEZ JR. and FRANCISCO SOTO

47. On October 12, 2007, at approximately 10:11 a.m., (Call Session 1006/4), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from JAVIER GARCIA. During the conversation, JAVIER GARCIA stated, "Because my buddy knocked off the ah five [stutters] the five dollars." [JAVIER GARCIA told FRANCISCO MENDEZ-NUNEZ his source of supply of cocaine took off $500 per kilogram of cocaine.] FRANCISCO MENDEZ-NUNEZ then said, "Yeah?" JAVIER GARCIA then said, "Yeah!" FRANCISCO MENDEZ-NUNEZ then said, "And do you still have some there?" [FRANCISCO MENDEZ-NUNEZ asked if JAVIER GARCIA still had some kilograms of cocaine.] JAVIER GARCIA replied , "Yes! I told Paco but he said he was going to wait till you got here. He said you told him to wait!" [PACO is FRANCISCO MENDEZ JR.

27

a/k/a PACO, the son of FRANCISCO MENDEZ-NUNEZ.] FRANCISCO MENDEZ-NUNEZ said,

"It's because them over there don't want to ah..." JAVIER GARCIA replied, "That's what I heard."

FRANCISCO MENDEZ-NUNEZ further complained, "...they don't want to give anything."

[FRANCISCO MENDEZ-NUNEZ said his customers do not want to pay the prices for the cocaine.]

FRANCISCO MENDEZ-NUNEZ then said, "Talk to him and see if he can help you complete for two

trips and ah..." [FRANCISCO MENDEZ-NUNEZ told JAVIER GARCIA to speak with

FRANCISCO MENDEZ JR. and see if he can provide JAVIER GARCIA with the money to buy two

kilograms of cocaine from JAVIER GARCIA's source of supply.]

48.    On October 30, 2007, at approximately 3:07 p.m., (Call Session 1168) FRANCISCO

MENDEZ-NUNEZ received an incoming call on Target Phone 3 from JAVIER GARCIA. During

the conversation, FRANCISCO MENDEZ-NUNEZ said, "What's up?" JAVIER GARCIA replied,

"Well nothing, just here waiting for the visit." FRANCISCO MENDEZ-NUNEZ said, "What?"

JAVIER GARCIA said, "It's because you said you'd visit me on Monday, right?" FRANCISCO

MENDEZ-NUNEZ said, "No, [U/I] til tomorrow. [U/I] a little bit." JAVIER GARCIA said, "Oh

yeah." FRANCISCO MENDEZ-NUNEZ then said, "Are you working right now? Working?" [Based

on surveillance, your Affiant believes JAVIER GARCIA does not have a job and FRANCISCO

MENDEZ-NUNEZ was asking JAVIER GARCIA if he was selling drugs at that time.] JAVIER

GARCIA replied and said, "I'm going to school now. That's why I thought you wanted tomorrow..."

FRANCISCO MENDEZ-NUNEZ then said, "I'll call you tomorrow."

49.    On or about October 31, 2007, at approximately 11:46 a.m., (Call Session 1187)

FRANCISCO MENDEZ-NUNEZ placed an outgoing call using Target Phone 3 to JAVIER

GARCIA. During the call JAVIER GARCIA asked FRANCISCO MENDEZ-NUNEZ, "So are you

28

coming by later or what?" FRANCISCO MENDEZ-NUNEZ replied, "Yeah. Like around noon, I think." JAVIER GARCIA said, "But, I'm going to the store to pay some bills." FRANCISCO MENDEZ-NUNEZ replied, "Oh." JAVIER GARCIA said, "Okay, so call me..." FRANCISCO MENDEZ-NUNEZ said, "In the mean while, go pay your bills, if not I'll go see your brother-in-law." [FRANCISCO MENDEZ-NUNEZ told JAVIER GARCIA he could   purchase drugs from FRANCISCO SOTO.] JAVIER GARCIA then responded, "No, just call me whenever, whenever you're around here." FRANCISCO MENDEZ-NUNEZ said, "All right then."

50.    At approximately 12:15 p.m., (Call Session 1190) FRANCISCO MENDEZ-NUNEZ placed an outgoing call using Target Phone 3 to JAVIER GARCIA. During the conversation, FRANCISCO MENDEZ-NUNEZ said, "I'm here." JAVIER GARCIA responded, "Alright, I'm on my way. I was just in the back. I just came in. Let me go back." [JAVIER GARCIA said he just came in from his garage and he will go back to the garage to meet FRANCISCO MENDEZ-NUNEZ.]

51.    On November 9, 2007, at approximately 1:42 p.m. (Call Session 1372) FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from JAVIER GARCIA. During the conversation, JAVIER GARCIA asked FRANCISCO MENDEZ-NUNEZ, "Hey, I was going to ask you...are you going to need the other one? The one you had told me?"  [cocaine, probably a kilogram] FRANCISCO MENDEZ-NUNEZ replied, "That what?" JAVIER GARCIA said, "Are you going to need the other one?" FRANCISCO MENDEZ-NUNEZ replied, "I don't know...I don't think so...not right now." JAVIER GARCIA said, "Huh?" FRANCISCO MENDEZ-NUNEZ said, "Not right now...there are a lot of birds on the wire!" JAVIER GARCIA responded, "All right. Just let me know if you need the other one so that ah..." FRANCISCO MENDEZ-NUNEZ said, "No, forget it!" JAVIER GARCIA said, "Why because there are..." FRANCISCO MENDEZ-NUNEZ then said, "Let

29

me...let me see if I..." JAVIER GARCIA said, "All right."

52.     The above referenced calls demonstrate that JAVIER GARCIA supplied cocaine to FRANCISCO MENDEZ-NUNEZ. In addition, the calls and surveillance reveal JAVIER GARCIA's brother in-law FRANCISCO SOTO is assisting JAVIER GARCIA in distributing wholesale amounts of cocaine to customers including FRANCISCO MENDEZ-NUNEZ and SALVADOR GARCIA. The intercepted calls, in conjunction with the approximately 33.5 grams of cocaine seized on September 18, 2007 from SALVADOR GARCIA, demonstrate that JAVIER GARCIA and FRANCISCO SOTO became one of SALVADOR GARCIA's cocaine sources of supply when FRANCISCO MENDEZ-NUNEZ was in Mexico (as described below).

### E.     Cocaine Transactions and Related Surveillance Involving FRANCISCO MENDEZ-NUNEZ, FRANCISCO MENDEZ JR. and DON MCNISH

53.     During the investigation FRANCISCO MENDEZ-NUNEZ made two trips to Mexico. On September 14, 2007, agents followed FRANCISCO MENDEZ-NUNEZ and his wife to Midway Airport at which time they departed on an ATA Airlines flight to Guadalajara, Mexico. Agents observed FRANCISCO MENDEZ-NUNEZ return to Midway Airport on October 26, 2007, without his wife. Based on intercepted calls, and surveillance revealing his absence in Chicago, on approximately November 23, 2007, FRANCISCO MENDEZ-NUNEZ and his son FRANCISCO MENDEZ JR. left Chicago and drove to Mexico. Based on intercepted phone calls on Target Phone 3, FRANCISCO MENDEZ JR. returned to Chicago around December 1, 2007. FRANCISCO MENDEZ-NUNEZ did not return to Chicago until December 10, 2007 via ATA Airlines.

54.     On October 10, 2007, at approximately 12:39 p.m. (Call Session 1003), FRANCISCO

MENDEZ-NUNEZ received an incoming call on Target Phone 3 from DON MCNISH.[10]  DON

MCNISH asked FRANCISCO MENDEZ-NUNEZ, "Did you call your...did you call Francisco?"

[FRANCISCO MENDEZ JR.] FRANCISCO MENDEZ-NUNEZ replied, "Man, I don't want [U/I]

do that? [U/I]..." DON MCNISH responded, "Huh?" FRANCISCO MENDEZ-NUNEZ then said,

"There's one over there, but he can't find it. If he can find it, you know." DON MCNISH replied,

"Huh?" FRANCISCO MENDEZ-NUNEZ said, "There was one, in the garage! But he don't know

where." [FRANCISCO MENDEZ-NUNEZ was telling DON MCNISH that his son FRANCISCO

MENDEZ JR. could not find the one kilogram of cocaine in the garage of FRANCISCO MENDEZ-

NUNEZ.] FRANCISCO MENDEZ-NUNEZ told DON MCNISH, "He can't find it, so he got to wait

'til I get there." FRANCISCO MENDEZ-NUNEZ then said, "But if you want to go over there and talk

to him, he might give you some..." [FRANCISCO MENDEZ-NUNEZ told DON MCNISH to go see

his son FRANCISCO MENDEZ JR., and he might be able to give him an amount of cocaine.] DON

MCNISH replied, "Oh yeah. Yeah." FRANCISCO MENDEZ-NUNEZ further said, "At least a little

bit, for uh, you know." [FRANCISCO MENDEZ-NUNEZ told DON MCNISH that if he goes and

sees his son FRANCISCO MENDEZ JR. that FRANCISCO MENDEZ JR. might be able to give

DON MCNISH a little bit of cocaine.] DON MCNISH said, "Okay." FRANCISCO

MENDEZ-NUNEZ further stated, "One or two tacos for you." [An amount of drugs.] DON MCNISH

said, "Yeah, one or two taco, be good. But he don't answer the phone." FRANCISCO MENDEZ-

---

[10]The telephone number being used by DON MCNISH is a US Cellular phone subscribed to
DON MCNISH at 521 Engle Street, Dolton, Illinois. In addition the voicemail on the phone
indicates the owner's first name is "Don." On October 27, 2007, at approximately 5:14 p.m.,
(Call Session 1075) FRANCISCO MENDEZ-NUNEZ called DON MCNISH using Target Phone
3. During the call, FRANCISCO MENDEZ-NUNEZ left a message stating, "Hi Don, this is
Pancho."

NUNEZ then said, "Oh, well why don't you just come there, when you get off. You working today?" MCNISH said, "Uh, no." FRANCISCO MENDEZ-NUNEZ said, "Yeah. When you get off, you just come by, and tell him to call me, and I'll let...and I'll let him know [U/I]." DON MCNISH asked, "What, does he live at your house?" FRANCISCO MENDEZ-NUNEZ replied, "Yeah, at my house." DON MCNISH said, "Oh. Okay." FRANCISCO MENDEZ-NUNEZ said, "He lives downstairs, in the 1st floor." MCNISH said, "Yeah." FRANCISCO MENDEZ-NUNEZ said, "Knock in the basement." [FRANCISCO MENDEZ-NUNEZ told DON MCNISH to go see his son FRANCISCO MENDEZ JR. who lives in the basement of FRANCISCO MENDEZ-NUNEZ's residence so that FRANCISCO MENDEZ JR. can provide DON MCNISH with drugs.]

55.     On October 10, 2007, at approximately 12:43 p.m. (Call Session #1004), FRANCISCO MENDEZ-NUNEZ received an incoming call from FRANCISCO MENDEZ JR.[11] During the conversation, FRANCISCO MENDEZ JR. asked FRANCISCO MENDEZ-NUNEZ, "That Don called you?" [Referring to DON MCNISH and Call Session 1003] FRANCISCO MENDEZ-NUNEZ replied, "Yes!" FRANCISCO MENDEZ JR. again said, "Don." FRANCISCO MENDEZ-NUNEZ then said, "Well he, keeps bothering me but that asshole owes me money." FRANCISCO MENDEZ JR. said, "I know..." FRANCISCO MENDEZ-NUNEZ said, "How much did he leave you?" FRANCISCO MENDEZ JR. replied, "Shit, he didn't give me anything." FRANCISCO MENDEZ-NUNEZ said, "He told me he had left you some." FRANCISCO MENDEZ

---

[11]FRANCISCO MENDEZ JR. was using a telephone number subscribed to his wife. Based on surveillance and intercepted calls, the number is believed to be used by FRANCISCO MENDEZ JR. On October 15, 2007, agents placed a covert call to the number and observed and video recorded FRANCISCO MENDEZ JR. answer the call. Subsequent to the previously mentioned call, agents identified, through an Illinois driver's license photograph, FRANCISCO MENDEZ JR. as the individual who answered the covert call.

JR. said, "Yeah, because I gave him that. But he hasn't given me anything for that! [Stutters] The first time I saw him I expected him to give me something but he didn't give me anything." [FRANCISCO MENDEZ JR. told FRANCISCO MENDEZ-NUNEZ that he gave DON MCNISH an amount of drugs and DON MCNISH hasn't paid him for it.] FRANCISCO MENDEZ-NUNEZ said, "So why the fuck does he keep bothering me?" FRANCISCO MENDEZ JR. replied, "I don't know." FRANCISCO MENDEZ-NUNEZ then said, "Tell him to wait until I get there then." FRANCISCO MENDEZ JR. went on to say, "All right. Victor called me as well but I know he is not going to want to give more." [FRANCISCO MENDEZ JR. told FRANCISCO MENDEZ-NUNEZ that VICTOR VELAZQUEZ called and wanted an unknown amount of drugs but FRANCISCO MENDEZ JR. doesn't think he is willing to pay a higher price.] FRANCISCO MENDEZ-NUNEZ then said, "There was one there!" [Referring to a kilogram of cocaine.] FRANCISCO MENDEZ JR. said, "It's not there anymore." FRANCISCO MENDEZ-NUNEZ replied, "How? Well, who did you give it to?" FRANCISCO MENDEZ JR. replied, "Ah, Victor, (Individual L), and them." [FRANCISCO MENDEZ JR. told FRANCISCO MENDEZ-NUNEZ that the kilogram of cocaine in the garage was split between VICTOR VELAZQUEZ, Individual L, and others.] FRANCISCO MENDEZ-NUNEZ said, "A, fucken shit!" FRANCISCO MENDEZ JR. said "I'm just waiting on (Individual L)!" FRANCISCO MENDEZ-NUNEZ then said, "How much has that asshole give you? He owed me twenty-three pesos!" [MENDEZ-NUNEZ asked MENDEZ-NUNEZ how much money has Individual L paid and stated Individual L owes him money, probably $23,000.]

56.    On October 30, 2007, at approximately 10:43 a.m. (Call Session 1145), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from DON MCNISH. During the conversation, DON MCNISH stated, "I'm gonna get a hold of you, and we got to get things

straightened out with us, okay?" [DON MCNISH was referring to a drug debt owed to FRANCISCO MENDEZ-NUNEZ] FRANCISCO MENDEZ-NUNEZ replied, "Okay. All right." DON MCNISH further stated, "…I'm trying to get some money here today. Hopefully, I get some money, we work out something with the car, whatever we got to do, okay." FRANCISCO MENDEZ-NUNEZ said, "Okay. Okeydokey." DON MCNISH further added, "You gonna give me more tacos too?" [drugs] FRANCISCO MENDEZ-NUNEZ said, "I got a couple of tacos for you." DON MCNISH said, "That be good…We'll get, we'll get straightened out here, then I want to be squared by you, by uh, Thanksgiving I want to be down to zero, okay?" FRANCISCO MENDEZ-NUNEZ said, "Okay."

57.    On November 1, 2007, at approximately 2:55 p.m. (Call Session 1204), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from DON MCNISH.  During the conversation, DON MCNISH stated, "I got, I got a couple of bucks for you, and then we'll figure out what I…" FRANCISCO MENDEZ-NUNEZ said, "All right, sounds good," DON MCNISH went on to say, "I don't know if you picked up any extra tacos or not, did you?" [DON MCNISH asked FRANCISCO MENDEZ-NUNEZ if he has any drugs.] FRANCISCO MENDEZ-NUNEZ replied, "Yeah, why not." DON MCNISH and FRANCISCO MENDEZ-NUNEZ made arrangements to meet later that evening.

58.    On November 2, 2007, at approximately 2:48 p.m. (Call Session #1223), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from DON MCNISH. During the call, FRANCISCO MENDEZ-NUNEZ stated, "You were supposed to call me yesterday. I was waiting for your call." [DON MCNISH was supposed to meet with FRANCISCO MENDEZ-NUNEZ the previous day to pay him and pick up an unknown amount of drugs.] DON MCNISH replied, "No. I got home, I got home late. I was supposed to only work half a day, and then

34

I got stuck all day. I'm free, I don't know. If you're there, or no, or what. You, you tell me." FRANCISCO MENDEZ-NUNEZ said, "Well I told you, you supposed to call me yesterday. I was waiting for you." DON MCNISH said, "You're waiting on me?" FRANCISCO MENDEZ-NUNEZ said, "Yep." DON MCNISH replied, "Oh shit! You just…you, you gave all your food away to somebody else, either?" [DON MCNISH asked FRANCISCO MENDEZ-NUNEZ if he gave away all his drugs to someone else.] FRANCISCO MENDEZ-NUNEZ replied, "No, no, no, no, no, no, no!" DON MCNISH then said, "Okay. Okay. I'm leaving Orland. I'm gonna go to the currency get a couple of dollars, and then uh, I don't know if I meet you at four o'clock somewhere?" FRANCISCO MENDEZ-NUNEZ said, "Yeah, I can meet you over there by Menards." At approximately 4:26 p.m., (Call Session 1226) FRANCISCO MENDEZ-NUNEZ placed an outgoing call using Target Phone 3 to DON MCNISH. During the call, FRANCISCO MENDEZ-NUNEZ said, "Where are you at?" DON MCNISH said, "I'm to your left in a blue truck with a ladder sticking up. To your front, to the left, look to the left." FRANCISCO MENDEZ-NUNEZ said, "Oh." DON MCNISH asked, "Yeah, that's me, over here. Do you want me to go somewhere else?" FRANCISCO MENDEZ-NUNEZ replied, "All right [U/I]."

59.    On November 12, 2007, at approximately 12:56 p.m. (Call Session 1423), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from DON MCNISH. During the call, DON MCNISH asked FRANCISCO MENDEZ-NUNEZ, "So you want uh…what day you want to, you want to pick up the red car?" [DON MCNISH was giving FRANCISCO MENDEZ-NUNEZ a car as partial payment for a drug debt.] FRANCISCO MENDEZ-NUNEZ said, "Yeah, you working today?" DON MCNISH then said, "..if you want today you can have it, or do you want tomorrow, you can…" FRANCISCO MENDEZ-NUNEZ said, "No, today [U/I] o'clock…" DON

35

MCNISH then said, "Later in the week, later in the week...I, I...beside you're gone be paid this week, so I should get money by the end of the week, and we'll be, I'll be catching up with you." [DON MCNISH told FRANCISCO MENDEZ-NUNEZ he will have his debt paid by the end of the week.]

60.      On November 28, 2007, at approximately 2:46 p.m. (Call Session 1683), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from DON MCNISH. During the call, DON MCNISH stated, "Nothing. I'm picking up some money, and today, I wanna get some, you know I'm going away on Friday, to Jamaica.." [DON MCNISH asked FRANCISCO MENDEZ-NUNEZ for drugs.] FRANCISCO MENDEZ-NUNEZ replied, "Jamaica?" DON MCNISH answered, "Yeah. So, I'm supposed to go to [U/I] to pick up a check, three or four g's I want to give it to you before I go."[DON MCNISH wanted to pay FRANCISCO MENDEZ-NUNEZ between $3,000 and $4,000 before taking a trip to Jamaica.] FRANCISCO MENDEZ-NUNEZ said, "Why [U/I], let me talk to my son...he might come pick it up." DON MCNISH said, "Yeah, talk to him, or make something that..." FRANCISCO MENDEZ-NUNEZ said, "What?" DON MCNISH said, "...if maybe, I don't know if he has...but if he has just like a small one..." [DON MCNISH asked FRANCISCO MENDEZ-NUNEZ for an amount of drugs.] FRANCISCO MENDEZ-NUNEZ said, "When you come, when you come back, but make sure to save me, cause I'm gonna need it." [FRANCISCO MENDEZ-NUNEZ told DON MCNISH to save the money for him until he returns from Mexico because he is going to need it.] DON MCNISH said, "And then, if you have any loose, a little bit loose ones around, I might take one little one." [DON MCNISH asked FRANCISCO MENDEZ-NUNEZ for an amount of drugs.]

61.      On December 4, 2007, at approximately 1:47 p.m. (Call Session 1709), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from DON MCNISH. During the

call, DON MCNISH said, "Yeah, I talked to your son, yeah, yeah. But he got no tacos [U/I] though [U/I]. [DON MCNISH told MENDEZ-NUNEZ he spoke with his son FRANCISCO MENDEZ JR. and he did not have any drugs.] FRANCISCO MENDEZ-NUNEZ said, "Oh, he don't...he don't get you good tacos. He don't know where...[U/I] where I put it." [FRANCISCO MENDEZ-NUNEZ told DON MCNISH his son FRANCISCO MENDEZ JR. does not know where he hid the drugs.] DON MCNISH said, "Huh?" FRANCISCO MENDEZ-NUNEZ said, "I have to talk to him and let him know." DON MCNISH said, "Yeah, let him know, cause I got, I got some money for you so..." FRANCISCO MENDEZ-NUNEZ said, "All right." DON MCNISH then said, "...but if he get me a taco or two then I'll have more money when you come back, I'll give more money." [DON MCNISH told FRANCISCO MENDEZ-NUNEZ that if his son FRANCISCO MENDEZ JR. gives him an amount of drugs he can sell them and give FRANCISCO MENDEZ-NUNEZ more money when he returns from Mexico.] FRANCISCO MENDEZ-NUNEZ said, "Okay." DON MCNISH then said, "Then we get [U/I] by New Years...maybe we be at zero on New Years."

62.    On or about December 13, 2007, at approximately 2:37 p.m., agents observed FRANCISCO MENDEZ-NUNEZ depart his residence located at 10424 S. Avenue L, Chicago, Illinois. At approximately 3:13 p.m., FRANCISCO MENDEZ-NUNEZ parked his green Dodge Ram truck in front of DON MCNISH's residence located at 521 Engle Street, Dolton, Illinois. At approximately 3:14 p.m., agents observed DON MCNISH, who was identified based on an Illinois driver's license photograph listing the same address, exit the residence and enter FRANCISCO MENDEZ-NUNEZ's green Dodge Ram. At approximately 3:15 p.m., FRANCISCO MENDEZ-NUNEZ and DON MCNISH were observed driving away from DON MCNISH's residence. At approximately 3:17 p.m., agents observed FRANCISCO MENDEZ-NUNEZ and DON MCNISH

arrive and park in a parking lot at approximately 721 Engle Street, Dolton, Illinois. Neither

FRANCISCO MENDEZ-NUNEZ or DON MCNISH exited the vehicle. At approximately 3:21 p.m.,

FRANCISO MENDEZ-NUNEZ dropped DON MCNISH off and left the area.

**F.    Distributions of Cocaine from FRANCISCO MENDEZ-NUNEZ to VICTOR VELAZQUEZ**

63.    On or about November 4, 2007, at approximately 12:13 p.m., (Call Session 1243)

FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from VICTOR

VELAZQUEZ.[12] During the conversation, VICTOR VELAZQUEZ asked FRANCISCO

MENDEZ-NUNEZ, "What are you doing, where are you?" FRANCISCO MENDEZ-NUNEZ replied,

"I'm barely going to take a shower." VICTOR VELAZQUEZ said, "What do you mean, you don't

know? Are you going to pay for my gas if I go there all the time?" FRANCISCO MENDEZ-NUNEZ

replied, "I have been waiting for you all fuckin week." VICTOR VELAZQUEZ said, "You gave it

to me on Monday!" [FRANCISCO MENDEZ-NUNEZ gave VICTOR VELAZQUEZ an amount of

narcotics on Monday.] FRANCISCO MENDEZ-NUNEZ replied, "It's been a week already."

VICTOR VELAZQUEZ later said, "I have [stutters] I have four for you, I told you." [VICTOR

VELAZQUEZ told FRANCISCO MENDEZ-NUNEZ he had an amount of money to pay

FRANCISCO MENDEZ-NUNEZ for the drugs he supplied.] FRANCISCO MENDEZ-NUNEZ said,

"If not, go see if (Individual E) is there?" VICTOR VELAZQUEZ said, "You want me to leave it with

(Individual E)?" FRANCISCO MENDEZ-NUNEZ said, "Yes!"

---

[12] The phone number being used by VICTOR VELAZQUEZ is a US Cellular number subscribed
to VICTOR VELAZQUEZ. As described below, following intercepted conversations between
VICTOR VELAZQUEZ and FRANCISCO MENDEZ-NUNEZ, agents observed VICTOR
VELAZQUEZ, identified based upon a driver's license photograph and vehicle registration
information, meet with FRANCISCO MENDEZ-NUNEZ.

64.    At approximately 1:21 p.m., (Call Session 1248) FRANCISCO MENDEZ-NUNEZ received a call on Target Phone 3 from VICTOR VELAZQUEZ. During the call VICTOR VELAZQUEZ said, "Where are you, at home still?"FRANCISCO MENDEZ-NUNEZ said, "Yep." VICTOR VELAZQUEZ said, "I'll be right there, I'm at [U/I]." FRANCISCO MENDEZ-NUNEZ said, "But if you don't want to come, leave it with [U/I]." VICTOR VELAZQUEZ said, "No, better now at once, I'm on my already. What the fuck...bye."

65.    On or about November 7, 2007, at approximately 4:09 p.m., (Call Session 1339) FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from VICTOR VELAZQUEZ. During the call, FRANCISCO MENDEZ-NUNEZ said, "I've been real sick, man. If you want, go take it to (Individual F), and I'll stop over tomorrow to pick it up." [MENDEZ-NUNEZ told VICTOR VELAZQUEZ to deliver narcotics proceeds to Individual F.] VICTOR VELAZQUEZ said, "Okay. Then I'll call you in the morning."

66.    On or about November 7, 2007, at approximately 4:37 p.m., (Call Session 1347), FRANCISCO MENDEZ-NUNEZ received an incoming call from VICTOR VELAZQUEZ, who was using telephone number (773) 671-9315. During the call, VICTOR VELAZQUEZ stated, "Then I'll just wait until tomorrow. I need two t-shirts, okay. So I'll call you tomorrow morning. I'll go over, if I have too. Okay?" [VICTOR VELAZQUEZ asked FRANCISCO MENDEZ-NUNEZ for an amount of drugs, possibly two kilograms of cocaine, and told FRANCISCO MENDEZ-NUNEZ he would pick them up at FRANCISCO MENDEZ-NUNEZ's house.]

67.    On or about November 8, 2007, at approximately 7:44 p.m., (Call Session 1359), FRANCISCO MENDEZ-NUNEZ received an incoming call from VICTOR VELAZQUEZ. During the conversation, FRANCISCO MENDEZ-NUNEZ said, "I thought you were going to call me in the

morning? I was waiting for you over by (Individual E)'s?" VICTOR VELAZQUEZ said, "You're by (Individual F)'s?" FRANCISCO MENDEZ-NUNEZ said, "Am I with (Individual E)! It's eight o'clock already, I am going to sleep. I am still sick!" VICTOR VELAZQUEZ went on and said, "And ah yesterday you were like, Oh, I'm dying, I'm sick and..." FRANCISCO MENDEZ-NUNEZ said, "I'm sick. I am sick." VICTOR VELAZQUEZ told FRANCISCO MENDEZ-NUNEZ, "I was waiting all fuckin day for my two shirts and you don't call me." [VICTOR VELAZQUEZ told FRANCISCO MENDEZ-NUNEZ he was waiting on an amount of drugs, possibly 2 kilograms of cocaine.] FRANCISCO MENDEZ-NUNEZ said, "Go and talk to (Individual F)."

68. On or about November 20, 2007, at approximately 5:33 p.m., (Call Session 1604), FRANCISCO MENDEZ-NUNEZ placed an outgoing call using Target Phone 3 to VICTOR VELAZQUEZ. During the call VICTOR VELAZQUEZ said, "So tomorrow, tomorrow we'll go eat, all right?" FRANCISCO MENDEZ-NUNEZ said, "All right, then." VICTOR VELAZQUEZ then said, "Well if there's another one or two, bring them to me." [An amount of drugs.] FRANCISCO MENDEZ-NUNEZ said, "Well, let me see. Okay."

69. On or about November 21, 2007, at approximately 10:00 a.m., surveillance was established at a restaurant located at 2053-2057 W. 18th Street, Chicago, Illinois, in anticipation of a meeting between FRANCISCO MENDEZ-NUNEZ and VICTOR VELAZQUEZ. At approximately 10:13 a.m., surveillance observed VICTOR VELAZQUEZ's white Chevrolet Suburban bearing Illinois license plates 3061212, which is registered to VICTOR VELAZQUEZ, parked near the restaurant. At approximately 10:52 a.m., surveillance agents observed FRANCISCO MENDEZ-NUNEZ and Individual E arrive in a green Dodge pickup bearing Illinois license plates 98367F and park in the vicinity of the restaurant. At approximately 11:17 a.m., surveillance agents

40

observed the white Suburban depart the area. At approximately 11:24 a.m., surveillance agents observed VICTOR VELAZQUEZ, who was identified through an Illinois driver's license photograph, getting out of the white Chevy Suburban and walk toward his residence carrying a brown paper sack. At that time agents observed VICTOR VELAZQUEZ using a set of keys to enter the front door of the residence located at 2014 S. Blue Island Avenue, Chicago, Illinois.

70.    On or about November 26, 2007, at approximately 10:07 a.m., (Call Session 50), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from VICTOR VELAZQUEZ. VICTOR VELAZQUEZ asked FRANCISCO MENDEZ-NUNEZ, "Did you leave already?" FRANCISCO MENDEZ-NUNEZ said, "I'm here already." VICTOR VELAZQUEZ said, "Paco too, right?" [In the past, based on surveillance and intercepted communications, FRANCISCO MENDEZ JR. a/k/a PACO provided drugs to VICTOR VELAZQUEZ when FRANCISCO MENDEZ-NUNEZ was in Mexico.[13]] FRANCISCO MENDEZ-NUNEZ said, "Yes!, what's up?" VICTOR VELAZQUEZ said, "I can't talk to somebody over here, right?" [VICTOR VELAZQUEZ asked if there was someone else who could provide him with drugs.] FRANCISCO MENDEZ-NUNEZ said, "No!" VICTOR VELAZQUEZ asked, "When are you going to...?" FRANCISCO MENDEZ-NUNEZ said, "You didn't want to talk when I was there." [VICTOR VELAZQUEZ did not want any drugs when FRANCISCO MENDEZ-NUNEZ was in Chicago.] VICTOR VELAZQUEZ said, "I talked to you and you told me you were going to call me." FRANCISCO MENDEZ-NUNEZ said, "He'll be there on Saturday!" [FRANCISCO

---

[13]Based on an intercepted call on Target Phone 3 (Call Session 1004) on October 10, 2007, at approximately 12:43 p.m., as described above, FRANCISCO MENDEZ JR. stated to FRANCISCO MENDEZ-NUNEZ that he split up a kilogram of cocaine between "Ah, Victor, (Individual L) and them." [Victor is believed to be VICTOR VELAZQUEZ.]

41

MENDEZ-NUNEZ said FRANCISCO MENDEZ JR. will return to Chicago on Saturday.] VICTOR VELAZQUEZ said, "On Saturday? Okay...oh well! All right."

71.    On November 26, 2007, at approximately 11:17 a.m., (Call Session 51), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from VICTOR VELAZQUEZ who was using an unknown number. During the call, VICTOR VELAZQUEZ said, "I am here with (Individual E)." FRANCISCO MENDEZ-NUNEZ said, "With who? VICTOR VELAZQUEZ said, "With (Individual E)!" FRANCISCO MENDEZ-NUNEZ said, "Oh, leave me the tickets there because...." (FRANCISCO MENDEZ-NUNEZ asked VICTOR VELAZQUEZ to leave the money owed for cocaine with Individual E.) VICTOR VELAZQUEZ said, "I left them there already." Shortly thereafter, Individual F got on the phone with FRANCISCO MENDEZ-NUNEZ. Individual F said, "Hey, [U/I] is asking when you're coming back because he is desperate!" [Individual F was referring to VICTOR VELAZQUEZ, who wanted to know when FRANCISCO MENDEZ-NUNEZ would return because he needed to purchase drugs from him.] FRANCISCO MENDEZ-NUNEZ replied, "Ah, he acts stupid. When I am there he says, I don't want to take anything. I don't want to have papers in the [U/I]" Individual F then said, "Victor. He is asking what is he to do for a month. He says he is going to starve to death." FRANCISCO MENDEZ-NUNEZ then said, "I'm not going to be gone for a month."

### G.    Distributions of Cocaine by VICTOR VELAZQUEZ to SALVADOR GARCIA

72.    On October 9, 2007, at approximately 1:47 p.m., (Call Session 2913) SALVADOR GARCIA using Target Phone 2 placed an outgoing call to VICTOR VELAZQUEZ, who was using telephone number (773) 671-9315. During the call, VICTOR VELAZQUEZ asked SALVADOR GARCIA, "What, what do you want?" SALVADOR GARCIA said, "Can, can, can it be done?"

42

VICTOR VELAZQUEZ said, "What do you need, one?" [An amount of cocaine.] SALVADOR

GARCIA said, "Half." VICTOR VELAZQUEZ said, "Oh the half..." SALVADOR GARCIA said,

"No, it's better if I go home, and you call me later." VICTOR VELAZQUEZ acknowledged and said,

"Okay."

73.     At approximately 2:15 p.m., (Call Session 2914) SALVADOR GARCIA using Target

Phone 2 received an incoming call from VICTOR VELAZQUEZ.  VICTOR VELAZQUEZ said,

"Where are you?" SALVADOR GARCIA replied, "Here at home!" VICTOR VELAZQUEZ said,

"Okay, you come over this way. I'm, I'm about to get there, I'm at Cicero and the Expressway, now."

SALVADOR GARCIA said, "Uh, where to your house then?" VICTOR VELAZQUEZ said, "Yeah,

come to my alley. Just call me once you're there." At approximately 2:32 p.m., (Call Session 2915)

SALVADOR GARCIA using Target Phone 2 placed an outgoing call to VICTOR VELAZQUEZ.

During the call, SALVADOR GARCIA stated, "Are you there, or not?" VICTOR VELAZQUEZ said,

"I'm here already. Just come here, and I'll and I'll come out to the back. What side, what side are you

going to be on?" SALVADOR GARCIA said, "I'm over here, by Loomis."

74.     Based on the above-mentioned phone calls, agents established surveillance in the

vicinity of VICTOR VELAZQUEZ's residence, 2014 S. Blue Island Avenue, Chicago, Illinois. At

approximately 2:35 p.m., agents captured on video tape SALVADOR GARCIA arriving in a purple

Ford Mustang bearing Illinois license plates 6039979 in the alley behind the residence located at 2014

S. Blue Island Avenue. Minutes later, VICTOR VELAZQUEZ was captured proceeding from 21st

Street in a white Chevrolet Suburban bearing Illinois plates 3061212. Shortly thereafter, Agents

observed SALVADOR GARCIA approach VICTOR VELAZQUEZ's white Chevrolet Suburban.

Agents then observed SALVADOR GARCIA walk away from the white Chevrolet Suburban while

placing something in his pants pocket and proceeded back to the purple Ford Mustang. At approximately 2:58 p.m., (Call Session 2917) SALVADOR GARCIA using Target Phone 2 placed an outgoing call to VICTOR VELAZQUEZ. During the call, SALVADOR GARCIA stated to VICTOR VELAZQUEZ, "You came up short!" VICTOR VELAZQUEZ said, "How?" SALVADOR GARCIA said, "[U/I] It was point two." VICTOR VELAZQUEZ replied, "It's missing a...what?" SALVADOR GARCIA said, "Almost...Almost a..Almost one!" VICTOR VELAZQUEZ replied, "One gram?" SALVADOR GARCIA said, "Yeah." VICTOR VELAZQUEZ said, "I'll add it the next time." SALVADOR GARCIA said, "All right then."

75.     On October 10, 2007, at approximately 4:05 p.m., (Call Session 2946) SALVADOR GARCIA using Target Phone 2 placed an outgoing call to VICTOR VELAZQUEZ. During the call VICTOR VELAZQUEZ said, "What's up?" SALVADOR GARCIA said, "Can you?" [SALVADOR GARCIA asked VICTOR VELAZQUEZ if he can supply him with cocaine.] VICTOR VELAZQUEZ said, "Right now I'm here on 48th paying a city bill. I'll call you when I'm on my way over there." SALVADOR GARCIA said, "Hey! But...But include that from yesterday, dude." [SALVADOR GARCIA was referring to the gram of cocaine VICTOR VELAZQUEZ shorted him on October 9, 2007.] VICTOR VELAZQUEZ said, "Yeah! Yeah! Yeah! Yeah!" SALVADOR GARCIA said, "No! No! No! For real dude. How many times have I made a claim to you?" VICTOR VELAZQUEZ said, "I told you yes, motherfucker!" SALVADOR GARCIA said, "No I'm not fighting, dude." VICTOR VELAZQUEZ said, "I'll fuck you up." SALVADOR GARCIA said, "No! But how many times have I made a claim to you?" [SALVADOR GARCIA asked VICTOR VELAZQUEZ to tell him how many times SALVADOR GARCIA had complained to him about shorting him on drug transactions.] Based on the above referenced intercepted calls, SALVADOR GARCIA has made multiple drug

44

purchases from VICTOR VELAZQUEZ.

### H.    Certain Cocaine Distributions by SALVADOR GARCIA in May to July 2007

#### 1.    Possible Distribution of Cocaine to Individual G on May 29, 2007

76.    On or about May 29, 2007, agents established surveillance on SALVADOR GARCIA at Raul's Bar located at 3214 W. 47th Street, Chicago, Illinois. At approximately 5:20 p.m., agents observed SALVADOR GARCIA and an unknown Hispanic female enter a Ford Mustang and drive to the Walgreen's parking lot located at the corner of Kedzie and Archer in Chicago. Agents observed SALVADOR GARCIA exit the Ford Mustang and approach and enter a red Ford Taurus. As he entered the Taurus, agents observed SALVADOR GARCIA reach into his right front pants pocket. Moments later, SALVADOR GARCIA exited the Taurus and re-entered the Mustang. Surveillance maintained visual contact on the Taurus until the CPD initiated a traffic stop on the Taurus for a broken tail light. The driver, later identified as Individual G, could not produce a valid license and was taken into custody. An inventory search of the vehicle yielded a plastic baggie containing suspect cocaine. Individual G also provided officers with a second baggie of suspect cocaine which was concealed on her person. Individual G declined to make a statement. Individual G was charged with possession of a controlled substance. According to toll records, there were contacts between Target Phone 2 and a cellular phone subscribed to Individual G at approximately 2:14 p.m. and 3:12 p.m. on May 29, 2007. The case against Individual G was later stricken on leave. According to laboratory analysis, the two bags contained a total of 1.5 grams of powder cocaine.

#### 2.    Controlled Purchase by CS-2 on June 27, 2007

77.    On or about June 27, 2007, DEA agents made plans for CS-2 to purchase cocaine from SALVADOR GARCIA. At approximately 5:13 p.m., in the presence of agents, CS-2 placed a

consensually recorded call to Target Phone 2. (This call was verified on pen register records.) From prior conversations with SALVADOR GARCIA, CS-2 recognized the voice on Target Phone 2 as that of SALVADOR GARCIA. According to CS-2 and preliminary transcripts, SALVADOR GARCIA told CS-2 that he would meet CS-2 but that CS-2 would have to go to 47th and Laflin [the location of the Mi Segunda Casa bar].

78.    At approximately 5:16 p.m., in the presence of agents, CS-2 placed a second consensually recorded call to Target Phone 2. During the call, CS-2 said, "Hey Chava" and SALVADOR GARCIA responded, "Yes." CS-2 told SALVADOR GARCIA that he/she would call SALVADOR GARCIA when he/she was outside. SALVADOR GARCIA said, "Okay." Agents also searched CS-2 and CS-2's vehicle for contraband and cash with negative results, equipped CS-2 with an undercover recording device, and provided CS-2 with pre-recorded funds. After the search, agents kept CS-2 under constant surveillance.

79.    At approximately 5:30 p.m., agents observed SALVADOR GARCIA standing in front of the Mi Segunda Casa bar. At approximately 5:37 p.m., CS-2 received an incoming consensually recorded call from SALVADOR GARCIA on Target Phone 2 who stated to CS-2, "Are you close by or no?" CS-2 said, "Yeah, you know what? Almost, almost...should I meet you at the Aldi's parking lot or what?" SALVADOR GARCIA responded, "No, why don't you stop here by...[U/I]...and pick me up. You can give me the ball here."

80.    At approximately 5:47 p.m., agents observed and videotaped CS-2 arrive near the Mi Segunda Casa bar, pick up SALVADOR GARCIA, and proceed westbound on 47th Street. During the meeting with SALVADOR GARCIA, which was recorded, CS-2 stated, "Well, look, let's see if we can do the same thing. Give me two for sixty. If you can." SALVADOR GARCIA responded by

saying, "Okay, yeah." According to CS-2, after entering CS-2's vehicle, SALVADOR GARCIA

reached into his pocket and pulled out a clear plastic bag containing multiple smaller plastic baggies

that contained a white powdery substance [cocaine]. According to CS-2, SALVADOR GARCIA

removed two of the small plastic baggies containing cocaine and placed them into the center console

of CS-2's vehicle. At that time, CS-2 placed $60 in the console next to the two small plastic bags of

cocaine. SALVADOR GARCIA removed the buy money. A short time later, SALVADOR GARCIA

exited CS-2's vehicle and entered the Ford Mustang. Agents continued to keep CS-2 under

surveillance until CS-2 reached a safe meeting point. Agents subsequently recovered the two bags

containing suspect cocaine from the console. The white powdery substance in the bags field tested

positive for cocaine. The bags were submitted for laboratory analysis and the white substance was

determined to be approximately 1.2 grams of cocaine. CS-2 and CS-2's vehicle were searched again

for contraband and excess buy money with negative results. Agents also recovered the recording

device.

### 3.    Controlled Purchase by CS-2 on July 11, 2007

81.    On or about July 11, 2007, agents made plans for CS-2 to purchase cocaine from

SALVADOR GARCIA. At approximately 4:50 p.m., agents observed SALVADOR GARCIA'S Ford

Mustang parked in the parking lot at Raul's Bar. At approximately 5:09 p.m., in the presence of

agents, CS-2 placed a consensually recorded phone call to SALVADOR GARCIA on Target Phone

2 and arranged to meet SALVADOR GARCIA at Raul's Bar to purchase a small amount of cocaine.

During the consensually recorded call, CS-2 stated, "Hey, what are you doing, man?" SALVADOR

GARCIA responded, "Here with Raul." CS-2 then asked, "Uhm...Could I go see you?" SALVADOR

GARCIA responded, "Yeah, but only if you come in." Agents also searched CS-2 and CS-2's vehicle

for contraband and cash with negative results, equipped him with an undercover recording device, and provided him with pre-recorded buy money. After the search, agents kept CS-2 under constant surveillance.

82.    At approximately 5:22 p.m., CS-2 placed a second phone call to SALVADOR GARCIA to notify him he/she was waiting in the parking lot, according to CS-2. (The phone call was partially recorded by a recording device that CS-2 was wearing; the only voice heard is CS-2.) According to CS-2, CS-2 convinced SALVADOR GARCIA to exit the bar and meet CS-2 in the parking lot. At approximately 5:22 p.m., agents observed and video recorded SALVADOR GARCIA exit Raul's Bar and approach the passenger side of CS-2's vehicle. According to CS-2 and surveillance, SALVADOR GARCIA approached the passenger-side door of CS's vehicle and leaned into the vehicle. CS-2 then stated to SALVADOR GARCIA, "Could you give me two? Or not?" SALVADOR GARCIA then said, "What do you mean?" CS-2 then said, "Like last time." SALVADOR GARCIA then replied, "Yeah but here goes one." According to CS-2, SALVADOR GARCIA then tossed one clear plastic baggie containing a white powdery substance into CS-2's vehicle on the passenger seat. According to CS-2, SALVADOR GARCIA entered CS-2's vehicle. CS-2 advised that SALVADOR GARCIA was very nervous and looking around at an unrelated vehicle that entered the parking lot near their location. CS-2 stated that after SALVADOR GARCIA calmed down, he placed a second clear plastic baggie containing a white powdery substance into the console of CS-2 vehicle. CS-2 stated he/she then handed SALVADOR GARCIA the buy money at which time SALVADOR GARCIA counted it. After a brief conversation, SALVADOR GARCIA exited CS-2 vehicle, entered the Ford Mustang, and left the area. Agents kept CS-2 under constant surveillance until CS-2 reached a safe meeting point. Agents there recovered the two bags from the

console. The bags were submitted for laboratory analysis and the white substance was determined to be approximately 1.5 grams of cocaine. Agents also searched CS-2 and CS-2's vehicle for contraband and excess buy money with negative results and recovered the recording device.

I.    **Calls Related to Drug Trafficking and Money Transfers Between SALVADOR GARCIA, FRANCISCO MENDEZ-NUNEZ and FRANCISCO MENDEZ JR.**

83.    On or about August 18, 2007, at approximately 7:21 p.m., FRANCISCO MENDEZ-NUNEZ used Target Phone 3 to call SALVADOR GARCIA at Target Phone 2. (Call Session 223) During the conversation, FRANCISCO MENDEZ-NUNEZ tried to convince SALVADOR GARCIA to come to the restaurant where he was eating. SALVADOR GARCIA said to FRANCISCO MENDEZ-NUNEZ, "Stupid...a sick one just called me." [Meaning a cocaine customer just called him.] FRANCISCO MENDEZ-NUNEZ responded, "There is one over here too." [FRANCISCO MENDEZ-NUNEZ wanted SALVADOR GARCIA to come to where he was because there was a cocaine customer there too.]

84.    On or about August 21, 2007, at approximately 1:33 p.m., SALVADOR GARCIA used Target Phone 2 to call FRANCISCO MENDEZ-NUNEZ on Target Phone 3. (Call Session 330) During the conversation, SALVADOR GARCIA stated, "I want to give you something." FRANCISCO MENDEZ-NUNEZ said, "I was going to look for you because I need to send some money [narcotics proceeds] over there [Mexico]."[14] FRANCISCO MENDEZ-NUNEZ said, "Let me go send some over here and then I'll go over there and we'll send the rest from over there." FRANCISCO MENDEZ-NUNEZ then said, "With your name." [FRANCISCO MENDEZ-NUNEZ

---

[14]Based on extensive physical and electronic surveillance conducted as part of the investigation, it is your Affiant's belief that FRANCISCO MENDEZ-NUNEZ is not legitimately employed in the United States.

wanted to send narcotics proceeds to Mexico using SALVADOR GARCIA's name.]

85.    On or about August 22, 2007, at approximately 1:57 p.m., SALVADOR GARCIA

used Target Phone 2 to call FRANCISCO MENDEZ-NUNEZ on Target Phone 3.(Call Session 365)

SALVADOR GARCIA called FRANCISCO MENDEZ-NUNEZ to find out where he was and asked,

"No too much. I just wanted to I wanted to stop by and say hello to you. I was getting to the, you were

on your way out." [SALVADOR GARCIA was out of cocaine and wanted to come and get some from

FRANCISCO MENDEZ-NUNEZ.] FRANCISCO MENDEZ-NUNEZ then told SALVADOR

GARCIA, "If you want we'll meet tomorrow morning to see what's up." At approximately 6:02 p.m.,

SALVADOR GARCIA received an incoming call from Individual H.  (Call Session 371) During the

conversation, SALVADOR GARCIA stated, "You finished all of it alone?" [Used all of the cocaine

by herself.] Individual H went on to say, "My friend. Uh can you do it tomorrow?" SALVADOR

GARCIA said, "Tomorrow, Tomorrow I am going to arrive like at the same time around there.

Because...until that time they are going to. Until that time they are going to bring me the pants."

[SALVADOR GARCIA will not have cocaine until they bring it to him tomorrow.] Individual H

asked, "Okay, okay. But if you see something like that. Uh...we will do it like that. Bring me the same

but less." [Individual H asked SALVADOR GARCIA to bring her a smaller amount of cocaine than

SALVADOR GARCIA had given her on a prior occasion.] SALVADOR  GARCIA said, "Less?"

Individual H said, "Well no. Or more however. I had a lot. I thought it was good."  Individual H went

on to say she was going to introduce a friend to SALVADOR GARCIA and the two agreed to meet

the following day.  It is your Affiant's belief based on the two previous calls that SALVADOR

GARCIA was out of cocaine and he was trying to replenish his supply by going to "say hello" to

FRANCISCO MENDEZ-NUNEZ.    SALVADOR GARCIA was told by FRANCISCO

50

MENDEZ-NUNEZ that he could not see him until the next day. SALVADOR GARCIA then told Individual H (a customer) that he could not see her until the next day.

86.    On or about August 25, 2007, at approximately 7:44 p.m., SALVADOR GARCIA using Target Phone 2 placed an outgoing call to FRANCISCO MENDEZ-NUNEZ at phone number (773) 315-0030. (Call Session 590) During the conversation, FRANCISCO MENDEZ-NUNEZ told SALVADOR GARCIA, "Oh! My buddy was going to send me something else." [FRANCISCO MENDEZ-NUNEZ was going to receive an amount of drugs from a friend.] SALVADOR GARCIA then said, "Oh yeah, yeah. We are going to go over there about 9:00. We'll be there around 9:00."

87.    On or about August 25, 2007, at approximately 7:45 p.m., SALVADOR GARCIA used Target Phone 2 to place an outgoing call to Individual M.  (Call Session 592) Based on other intercepted calls, Individual M appears to be a cocaine customer of SALVADOR GARCIA.  During the above-referenced call, Individual M asked SALVADOR GARCIA, "What's up? What time are you coming?" SALVADOR GARCIA then told Individual M, "No, no right now I'm telling you that...Maybe around 11:00" [SALVADOR GARCIA told her that he can't deliver cocaine to her until 11:00.] SALVADOR GARCIA then told Individual M that he is on his way to Indiana. [FRANCISCO MENDEZ-NUNEZ lives near the Illinois and Indiana border.]  Based on the above mentioned calls, your Affiant believes SALVADOR GARCIA was going to FRANCISCO MENDEZ-NUNEZ's residence to pick up cocaine and intending thereafter to deliver cocaine to Individual M.

88.    On or about October 23, 2007, at approximately 1:13 p.m., FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from FRANCISCO MENDEZ JR.(Call Session 17).  The following call occurred while FRANCISCO MENDEZ-NUNEZ was in Mexico and

51

FRANCISCO MENDEZ JR. was in Chicago, Illinois. During the conversation, FRANCISCO MENDEZ JR. asked, "All right. So, that you wanted me to send you some money?" FRANCISCO MENDEZ-NUNEZ said, " If you want. Because I think your mom's going to stay. Didn't you speak with her?" FRANCISCO MENDEZ JR. then said, "I already talked to her and told her...Because (Individual F) called me yesterday and told me to go and get the money." FRANCISCO MENDEZ-NUNEZ then said, "It's because my buddy (Individual J) left me some money with him. So I need you to pick it up!" FRANCISCO MENDEZ JR. then said, "Huh? Well that's what I was thinking, but he told me no just send it to him, but I told him he's already coming on Thursday and he told me [U/I]." FRANCISCO MENDEZ-NUNEZ then said, "That's why, so if you go over there, go and pick it up, it's because I had told (Individual F) to tell him that I needed it, because the asshole will spend it all. Last year, he spend all of it and didn't pay me." FRANCISCO MENDEZ JR. then said, "I know...yeah, well uh...yeah, it's what I had imagined. All right." FRANCISCO MENDEZ-NUNEZ said, "So then, I'll call you if I need some."

89.    On or about October 24, 2007, at approximately 2:52 p.m., FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from FRANCISCO MENDEZ JR. (Call Session 1043). During the call, FRANCISCO MENDEZ JR. asked FRANCISCO MENDEZ-NUNEZ, "Bancomer or Banamex." FRANCISCO MENDEZ-NUNEZ replied, "No, it's at Order Express." FRANCISCO MENDEZ JR. then said, "I know it's Order Express, but they're asking me, to what bank over there? [FRANCISCO MENDEZ JR. is asking FRANCISCO MENDEZ-NUNEZ what bank should he send money to in Mexico.] FRANCISCO MENDEZ-NUNEZ said, "Send it to Casa Popular." FRANCISCO MENDEZ JR. asked, "Casa Popular?" FRANCISCO MENDEZ-NUNEZ then asked, "You should [U/I], I'm was asking.. isn't (Individual N) around there?" FRANCISCO

MENDEZ JR. said, "No, why? FRANCISCO MENDEZ-NUNEZ said, "So you can send some for me, and some others for him..." [FRANCISCO MENDEZ-NUNEZ asked if another individual was with FRANCISCO MENDEZ JR. so that the other person could also send money to another unknown person in Mexico without alerting banking officials.] FRANCISCO MENDEZ JR. said, "Well I came by myself over here, and you know [U/I]." FRANCISCO MENDEZ-NUNEZ then asked, "So ask how much one can send?" FRANCISCO MENDEZ JR. later said, "That she doesn't know if they'll give you the $3,000 there. She is going to verify." FRANCISCO MENDEZ-NUNEZ said, "It's cause if you send me $3,000 then they'll ask for identification and all that shit. That's why I told you to take someone with you so each of you could send $1500 and $1500." FRANCISCO MENDEZ JR. said, "It's the same, if I send more then a $1,000. They still ask me for one." FRANCISCO MENDEZ-NUNEZ said, "No, they've never asked me for one, up to $1900.00. We'll get the paper here." FRANCISCO MENDEZ JR. said, "Because they are asking me for my social and everything." FRANCISCO MENDEZ-NUNEZ said, "That's what I'm telling you, tell them you're sending less than $2,000.00, they won't ask for a social or anything." FRANCISCO MENDEZ JR. replied, "Oh, okay. Then I'll call you right back."

**J.    Calls Relating to Drugs and Money Transfers by SALVADOR GARCIA, FRANCISCO MENDEZ-NUNEZ, and Individual J.**

90.    On August 22, 2007, at approximately 2:14 p.m. (Call Session #64), SALVADOR GARCIA placed an outgoing call to Individual J who was using telephone number (708) 969-7810.[15]

---

[15]On September 3, 2007, at approximately 6:27 p.m., (Call Session 1096) SALVADOR GARCIA received an incoming call from Individual J, who was using a phone subscribed to SALVADOR GARCIA. During the call Individual J asked SALVADOR GARCIA to come and pick him up at the Mi Segunda Bar. A short time later surveillance observed SALVADOR GARCIA arrive at the Mi Segunda Bar and pick up Individual J, who was identified based on an Illinois driver's

During the conversation SALVADOR GARCIA asked, "Do you have it with you?" Individual J replied, "The ball." [Which may refer to an 1/8 of an ounce of cocaine.] Later in the conversation, Individual J said to SALVADOR GARCIA, "Tomorrow I'll cover you up." [Meaning Individual J will give SALVADOR GARCIA the "ball."]

91.     On September 12, 2007, at approximately 5:11 p.m., (Call Session 166) FRANCISCO MENDEZ-NUNEZ, who was using Target Phone 3, called SALVADOR GARCIA on Target Phone 2. During the conversation, FRANCISCO MENDEZ-NUNEZ said, "I'll see you tomorrow morning because I'm leaving Friday morning." SALVADOR GARCIA said, "That's fine." FRANCISCO MENDEZ-NUNEZ then said, "For two weeks, to check how they are doing...call the sergeant and ask him." [Based on previous calls, Individual J is believed to be the sergeant. FRANCISCO MENDEZ-NUNEZ told SALVADOR GARCIA he would be in Mexico for two weeks and for SALVADOR GARCIA to call Individual J to check how the cocaine customers were doing.] SALVADOR GARCIA said, "Okay then. I'll let this guy know."

92.     At approximately 5:22 p.m., (Call Session 1476) SALVADOR GARCIA, who was using Target Phone 2 called Individual J on (708) 969-7810. During the conversation, SALVADOR GARCIA asked Individual J, "Did he call you already or no?" [SALVADOR GARCIA asked did FRANCISCO MENDEZ-NUNEZ call yet?] Individual J replied, "What? No!" SALVADOR GARCIA then said, "Did he call you? That he is going to come tomorrow at about noon. He leaves to Mexico on Friday." [SALVADOR GARCIA told Individual J that FRANCISCO MENDEZ-NUNEZ would come by the next day at noon before he left for Mexico.] Individual J then said, "And what did he want tickets?" [Tickets may be code for money.] SALVADOR GARCIA replied, "No

license photograph.

54

but I imagine so but he said he would come tomorrow." Individual J said, "Oh all right but he hasn't

called me." SALVADOR GARCIA said, "He told me to let you know." Individual J acknowledged

SALVADOR GARCIA and said he would see SALVADOR GARCIA the next day.

93. Based on intercepted calls and surveillance, Individual J, SALVADOR GARCIA and

FRANCISCO MENDEZ-NUNEZ are not known to have met on September 13, 2007.

94. On September 14, 2007, at approximately 12:40 p.m., (Call Session 1583),

FRANCISCO MENDEZ-NUNEZ received and incoming call on TARGET PHONE 3 from

SALVADOR GARCIA who was using TARGET PHONE 2. During the call, SALVADOR GARCIA

said, "I said yes, Where are you?" FRANCISCO MENDEZ-NUNEZ replied, "On the plane!" [Based

on surveillance and intercepted calls FRANCISCO MENDEZ-NUNEZ traveled to Mexico at least

twice during the investigation.] SALVADOR GARCIA said, "Fucken shit! What do you mean in the

plane?" FRANCISCO MENDEZ-NUNEZ said, "I was waiting for you and Cuco yesterday." ["Cuco"

is a nickname for Individual J.] SALVADOR GARCIA said, "I got home yesterday at about 6:00 in

the evening." FRANCISCO MENDEZ-NUNEZ said, "Yeah, he told me. My buddy had the rent

money for me. Hold it for me because if not he will spend it." [FRANCISCO MENDEZ-NUNEZ told

SALVADOR GARCIA to hold narcotics proceeds for him so it doesn't get spent.] SALVADOR

GARCIA said, "Oh, okay." FRANCISCO MENDEZ-NUNEZ said, "And ah Paco...Paco will be back

on Sunday." [FRANCISCO MENDEZ-NUNEZ told SALVADOR GARCIA to give the narcotics

proceeds to Paco (FRANCISCO MENDEZ JR.) on Sunday.]

95. At approximately 12:51 p.m., (Call Session 1584), Individual J, using telephone

number (708) 969-7810, called SALVADOR GARCIA on Target Phone 2. During the conversation,

SALVADOR GARCIA notified Individual J that FRANCISCO MENDEZ-NUNEZ already left for

two weeks to Mexico. Also during the conversation, SALVADOR GARCIA said, "And that Paco would come on Sunday." Individual J responded, "Oh, that's why..." SALVADOR GARCIA then said, "He said to give him the rent money." Individual J said, "To who?" SALVADOR GARCIA again said, "Paco!" Individual J said, "Oh, okay. That's why he didn't call." [SALVADOR GARCIA told Individual J that FRANCISCO MENDEZ-NUNEZ said to give the money "Paco" who is believed based on previous calls to be FRANCISCO MENDEZ JR.]

96.     On September 17, 2007, at approximately 12:44 p.m., (Call Session 1774), SALVADOR GARCIA using Target Phone 2 placed an outgoing call to Individual J. During the call Individual J said, "No! No, I was calling you dude because I was adding minutes..." [Adding minutes to his cell phone.] SALVADOR GARCIA said, "Oh." Individual J then said, "...and I told them to change to a different phone..." SALVADOR GARCIA asked, "What did they tell you?" Individual J then said, "[sneezes] number and asked me whose name was it under. Is it under your name? Or how did you do it?" [Individual J asked SALVADOR GARCIA if one of the cell phones he is using is under SALVADOR GARCIA's name or someone else. It is common among drug traffickers to place cell phones in other peoples names to avoid detection by police. The phone number intercepted on Target Phone 2 and Target Phone 3 that is being used by Individual J is subscribed to SALVADOR GARCIA.] SALVADOR GARCIA then said, "Yeah, my name!" Individual J then said, "Your name? Oh, it's because they are going to ask me for you information...name and I said, I don't know, his name is Salvador but I don't know his last name." SALVADOR GARCIA then said, "Oh." The two then agree to meet at a later time.

97.     On October 22, 2007 at approximately 11:33 a.m., (Call Session 1023) FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from Individual J. During the call

FRANCISCO MENDEZ-NUNEZ said, "You know with who...If you have a chance, take it to (Individual F)'s, he knows how to send it." ["It" is believed to be narcotics proceeds. FRANCISCO MENDEZ-NUNEZ wanted him to give it to Individual F who knows how to send the money to him in Mexico] Individual J replied, "Yeah, that's what I'm saying, if you want I'll take it to him, since he already knows how." FRANCISCO MENDEZ-NUNEZ then said, "Yes. He has a machine there." Individual J asked, "Okay. So do you want me to send you the two?" [An amount of money.] FRANCISCO MENDEZ-NUNEZ replied, "Well yeah."

98.     On or about October 23, 2007, at approximately 1:13 p.m., FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from FRANCISCO MENDEZ JR.(Call Session 17). The following call occurred while FRANCISCO MENDEZ-NUNEZ was in Mexico and FRANCISCO MENDEZ JR. was in Chicago, Illinois. During the conversation, FRANCISCO MENDEZ JR. asked, "All right. So, that you wanted me to send you some money?" FRANCISCO MENDEZ-NUNEZ said, " If you want. Because I think your mom's going to stay. Didn't you speak with her?" FRANCISCO MENDEZ JR. then said, "I already talked to her and told her...Because (Individual F) called me yesterday and told me to go and get the money." FRANCISCO MENDEZ-NUNEZ then said, "It's because my buddy Cuco left me some money with him. So I need you to pick it up!" FRANCISCO MENDEZ JR. then said, "Huh? Well that's what I was thinking, but he told me no just send it to him, but I told him he's already coming on Thursday and he told me [U/I]." FRANCISCO MENDEZ-NUNEZ then said, "That's why, so if you go over there, go and pick it up, it's because I had told (Individual F) to tell him that I needed it, because the asshole will spend it all. Last year, he spend all of it and didn't pay me." FRANCISCO MENDEZ JR. then said, "I know...yeah, well uh...yeah, it's what I had imagined. All right." FRANCISCO MENDEZ-NUNEZ

57

said, "So then, I'll call you if I need some."

## VI.    SEARCH WARRANTS

### A.    Background

99.    This Affidavit is also submitted for the purpose of obtaining warrants to search the residences described below for drugs and/or records, as set forth in the respective Applications for Search Warrant with which this Affidavit is being be submitted.

100.    Based on my knowledge, training and experience, and discussions with other experienced law enforcement officers, I know that participants in long-term drug trafficking organizations, such as the one that is the subject of this Affidavit, frequently retain controlled substances and evidence of their unlawful activities at their residences for extended periods of time.

101.    Specifically, based on my knowledge, training and experience, and discussions with other experienced law enforcement officers, I know that drug traffickers regularly keep the following items at places within their control, including their residences, for extended periods of time:

a.    Financial information and statements, books, records, receipts, cash disbursement journals, cashier's checks, money orders, telegrams, letters of credit, bank statements, tax returns and other records related to the receipt, expenditure and concealment or other disposition of income, which may be maintained in either paper form or on computers, computer disks, CD-ROM disks, DVD disks or other related equipment;

b.    United States Currency, jewelry, and precious metals;

c.    Records, notebooks, memoranda, receipts, ledgers, photographs, lists, documents containing contact information for suppliers, couriers, customers and other documents relating to the purchase, sale or distribution of controlled substances, which may be maintained in

58

either paper form or on computers, computer disks, CD-ROM disks, DVD disks or other related equipment;

        d.      Books, records, lists, receipts, bank and savings and loan records of deposit, statements and other bank records, letters of credit, money orders, cashiers' checks, passbooks, canceled checks, certificates of deposit, lease agreements, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, and other documents relating to the receipt and other disposition of income and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, vehicles, jewelry and furniture,  which may be maintained in either paper form or on computers, computer disks, CD-ROM disks, DVD disks or other related equipment;

        e.      Indicia of ownership, occupancy or residency of the premises being searched, including utility and telephone bills, keys, lease agreements, mortgage records, loan documents, service contracts, remodeling contracts and repair contracts;

        f.      Safes, safety-deposit boxes, keys for safety-deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of narcotics-trafficking activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, rare coins, works of art, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value;

        g.      Photographs and videotapes of defendants with coconspirators and assets obtained from drug proceeds;

        h.      Mobile cellular telephones, pagers and other related equipment and the contents

thereof, including antennas and power sources;

      I.    Unauthorized access devices, commonly known as cellular telephone cloning devices, and the contents thereof; and

      j.    Money counting machines.

    102.    These warrants do not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather these warrants authorize the removal of computers and related media so that they may be searched in a secure environment. The search shall be done pursuant to the following protocol: With respect to the search of any computers or electronic storage devices seized from the premises identified herein, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a.    examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

    b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c.    surveying various file directories and the individual files they contain to determine

whether they include data falling within the list of items to be seized as set forth herein;

    d.    opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

    e.    scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

    f.    performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

    103.    Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, as dictated by the volume and complexity of the items seized, excluding any items or materials deemed to be contraband or materially relevant to this investigation, or unless otherwise ordered by the Court.

**B.**    **Premises to be Searched for Drugs and Records Relating to Drug Trafficking**

    104.    Based upon my knowledge, training and experience, and all the information contained in this Affidavit, I respectfully submit there is probable cause to believe that controlled substances, as well as the items set forth above in paragraph 101, are located at the premises described below:

    1.    **The premises known as 10424 S. Avenue L, Unit 2 and detached garage, Chicago, Illinois (the residence of FRANCISCO MENDEZ-NUNEZ)**

    a.    **Probable cause**

    105.    The premises known as 10424 S. Avenue L, Unit 2, Illinois, including detached

garage, is located at a two-unit building consisting of a yellow-framed two-story building with an upstairs apartment and basement apartment. It is located on the west side of Avenue L, south of the intersection of East 104th street. The address of the building is displayed on the left side of the main front door of the residence. To access the front door of the premises it is necessary to climb one flight of cement stairs that lead directly to the main entrance of the building. To gain access to the cement stairs it is necessary to enter a black wrought iron gate, which requires the use of a key. The apartment to be searched is the upstairs apartment. The detached garage to be searched is located at the rear of the property. The garage appears yellow-framed with a white door. There are no visible address identifiers displayed anywhere on the garage.

106.    Physical surveillance conducted throughout the investigation, including in December 2007, has revealed that FRANCISCO MENDEZ-NUNEZ currently resides in the upstairs unit at the premises and that his son, FRANCISCO MENDEZ JR., resides in the basement unit. Surveillance conducted as part of the investigation revealed FRANCISCO MENDEZ-NUNEZ and vehicles utilized by him arrive and depart the residence at various hours of the day and night. For example, on or about December 12, 2007, agents observed FRANCISCO MENDEZ-NUNEZ enter the gate surrounding the residence, which required the use of a key. Further, as part of the investigation, agents deployed a surreptitious video surveillance camera located in an alleyway at the rear of the residence facing the garage, which has captured FRANCISCO MENDEZ-NUNEZ entering and exiting the garage to be searched on multiple occasions. According to records provided by the Chicago Water Company and ComEd, the utility bills for 10424 S. Avenue L, Chicago, Illinois, Unit 2 are in the name Francisco J. Mendez. In addition, Target Phone 3, used by FRANCISCO MENDEZ-NUNEZ, is subscribed to Francisco Mendez, 10424 S. Avenue L, Chicago, Illinois.

Records of the Illinois Secretary of State revealed that on November 17, 2005, FRANCISCO MENDEZ-NUNEZ was issued an Illinois driver's license that listed 10424 S. Avenue L, Chicago, Illinois as his residence.

107.    As described in detail above, FRANCISCO MENDEZ-NUNEZ operates a high-volume drug distribution business in Chicago. The investigation has revealed that FRANCISCO MENDEZ-NUNEZ has utilized the premises to be searched in furtherance of those activities, including for storing drugs and drug proceeds. For example, as described above in paragraphs 15-16, after Individual B picked up two kilograms of cocaine, Individual B went with Individual D to FRANCISCO MENDEZ-NUNEZ's residence, met with FRANCISCO MENDEZ-NUNEZ in the rear of the residence and dropped off a plastic bag that I believe, based on my knowledge, training and experience, contained payment for the two kilograms of cocaine. In addition, in the intercepted calls described in paragraphs 53 to 55, FRANCISCO MENDEZ-NUNEZ discussed with DON MCNISH and his son FRANCISCO MENDEZ JR. that he had left a kilogram of cocaine hidden in the garage of the residence prior to FRANCISCO MENDEZ-NUNEZ's trip to Mexico.

**b.      Request for no-knock authority**

108.    I respectfully request that agents be authorized to execute the search warrant on this premises without knocking and announcing their presence. As described above, in order to gain entry to the main entrance of the residence, agents must enter a locked wrought iron fence and climb one flight of cement stairs. Based on your Affiant's experience, the excessive time needed to announce their presence at the locked wrought iron gate, breach the locked gate, go to the cement stairs, climb the cement stairs, and then make entry to the main entrance of the residence would expose the agents executing the search warrant to unnecessary danger by enabling the defendant to prepare for and

potentially assault the agents. In addition, it would require agents to approach the door without cover and in plain view of the defendant, rather than positioning themselves outside the potential line of fire before giving notice of their presence. Based on my knowledge, training and experience, I know that drug traffickers are regularly armed and dangerous. In addition to enabling the defendant to thwart law enforcement action, the delay caused by defendant's locked gate would also create an unreasonable risk that defendant would destroy evidence before agents could enter and secure the premises. Moreover, agents anticipate simultaneously executing a warrant to search the other unit at the premises, where FRANCISCO MENDEZ JR., a co-defendant, resides, further heightening the danger and risk of the destruction of evidence.

2.      **The premises known as 2846 W. 39th Place, Unit F, Chicago, Illinois (residence of FRANCISCO SOTO)**

109.    The premise known as 2846 W. 39th Place, Unit F, Chicago, Illinois, is located in a white frame house with two units in the primary residence, along with a coach house. The only visible house number is a black 28 on the east side on the screen door. The building has a chain link fence in front with a gate. With respect to the entrance to the first floor unit, concrete stairs lead to a wrought iron white screen door, which provides entry to the first floor unit. The second unit is in the basement and the entrance is in the back of the building on the west side. As noted above, the premises has a coach house in the rear, with the numbers 2846 displayed on the alley side. From the alley there is a black wrought iron gate that leads to a chain link gate. Affiant seeks authority to search only the first floor unit, not the second floor unit or the coach house.

110.    Physical surveillance conducted throughout the investigation, including on or about December 17, 2007, has revealed that FRANCISCO SOTO currently resides in the first floor unit of

64

the premises. During surveillance, agents have observed FRANCISCO SOTO enter and exit the first

floor unit. For example, as described above in paragraph 39, on or about September 18, 2007, agents

observed FRANCISCO SOTO use a key to enter the first floor unit of 2846 West 39th Place. In

addition, based on surveillance conducted on or about December 17, 2007, an officer was able to view

the inside of the residence when FRANCISCO SOTO opened the door to the first floor unit, thereby

determining that the exterior door opens directly into a residence (as opposed to a hallway leading to

multiple residences). In addition, during surveillance conducted as part of the investigation, agents

have observed FRANCISCO SOTO and a vehicle utilized by him arriving and departing 2846 W.

39th Place, Chicago, Illinois, at various hours of the day and night. Finally, according to records

provided by ComEd, FRANCISCO SOTO pays the utility bills for 2846 West 39th Place Unit F,

Chicago, Illinois.

111.    As described in detail above, FRANCISCO SOTO is a co-conspirator in a high volume

drug distribution business in Chicago. The investigation has revealed that FRANCISCO SOTO has

utilized the premises to be searched in furtherance of those activities, including for storing drugs and

drug proceeds. For example, as described above in paragraphs 39, 42 and 43, SALVADOR GARCIA

has traveled to the premises to pick up cocaine from FRANCISCO SOTO on more than one occasion.

Also, as described in paragraph 49, on or about October 31, 2007, during a call between

FRANCISCO MENDEZ-NUNEZ and JAVIER GARCIA, FRANCISCO MENDEZ-NUNEZ told

JAVIER GARCIA that he would go see FRANCISCO SOTO to purchase drugs if JAVIER GARCIA

was not available.

### C.    Premises to be Searched for Records Relating to Drug Trafficking

112.    Based upon my knowledge, training and experience, and all the information contained

65

in this Affidavit, I respectfully submit there is probable cause to believe that the items set forth above in paragraph 101 are located at the premises described below:

1.    **The premises known as 10424 S. Avenue L, Unit 1-Basement, Chicago, Illinois (the residence of FRANCISCO MENDEZ JR.)**

a.    **Probable cause**

113.    The premises known as 10424 S. Avenue L, Unit 1-Basement, Chicago, Illinois, is located in a two-unit building consisting of a yellow-framed, two-story building with an upstairs apartment and a downstairs apartment. It is located on the west side of Avenue L, south of the intersection of East 104th Street. The address of the building is displayed on the left side of the main front door of the residence. In order to gain access to the residence, it is necessary to enter a black wrought iron gate – which is located several feet from the basement's main entrance – and walk on the ground level to the south end of the building where there is a door on the southeast corner that leads directly into the basement. A key is required to enter the black wrought iron gate in front of the building.

114.    Physical surveillance conducted throughout the investigation, including in December 2007, has revealed that FRANCISCO MENDEZ JR. currently resides in the basement unit at the premises and that his father, FRANCISCO MENDEZ-NUNEZ, resides the upstairs unit. During the course of this investigation, agents have conducted fixed surveillance at 10424 S. Avenue L, Unit 1-Basement, Chicago, Illinois, and have observed FRANCISCO MENDEZ JR. and vehicles utilized by FRANCISCO MENDEZ JR. arrive and leave the residence at various hours of the day and night. As described above, agents deployed a surreptitious video surveillance camera located in an alleyway at the rear of the residence facing the garage, which has captured FRANCISCO MENDEZ JR.

66

entering and exiting the garage on multiple occasions. In addition, a Lexis Nexis search of the residence indicated that FRANCISCO MENDEZ JR. resides in apartment one at 10424 S. Avenue, L, Chicago, Illinois. Finally, on February 2, 2006, FRANCISCO MENDEZ JR. was issued an Illinois driver's license, which listed his address as 10424 S. Avenue L, Chicago, Illinois. As described above in paragraph 54, FRANCISCO MENDEZ-NUNEZ was intercepted telling DON MCNISH that FRANCISCO MENDEZ JR. lives in the basement.

115.    As described in detail above, FRANCISCO MENDEZ JR., assisted his father FRANCISCO-MENDEZ-NUNEZ in operating a high volume drug distribution business in Chicago. For example, as described in paragraph 49, FRANCISCO MENDEZ-NUNEZ told JAVIER GARCIA to speak with FRANCISCO MENDEZ JR. to see if FRANCISCO MENDEZ JR. could provide JAVIER GARCIA with the money to buy two kilograms of cocaine from JAVIER GARCIA's source of supply. Further, as described in paragraphs 54-55 and 61, FRANCISCO MENDEZ JR. supplied DON MCNISH, VICTOR VELAZQUEZ and Individual L with cocaine, in some instances, without receiving payment (*i.e.*, the cocaine was "fronted" for payment at a later time). Finally, as stated in Paragraph 89, during an intercepted call between FRANCISCO MENDEZ JR. and FRANCISCO MENDEZ-NUNEZ over Target Phone 3, FRANCISCO MENDEZ-NUNEZ instructed his son FRANCISCO MENDEZ JR. to send him an amount of money via a currency exchange to him in Mexico.

### b.    Request for no-knock authority

116.    I respectfully request that agents be authorized to execute the search warrant on this premises without knocking and announcing their presence. As described above, in order to gain entry to the basement apartment at 10424 S. Avenue, L, Chicago, Illinois, it is necessary to enter a black

wrought iron gate – which requires a key – located several feet from the basement's main entrance, and walk on the ground level to the south end of the building where there is a door on the southeast corner that leads to the basement. Based on your Affiant's experience, the excessive time needed to announce their presence at the locked wrought iron gate, breach the locked gate, and then proceed to the southeast corner of the building would expose the agents executing the search warrant to unnecessary danger by enabling the defendant to prepare for and potentially assault the agents. In addition, it would require agents to approach the door without cover and in plain view of the defendant, rather than positioning themselves outside the potential line of fire before giving notice of their presence. Based on my knowledge, training and experience, I know that drug traffickers are regularly armed and dangerous. In addition to enabling the defendant to thwart law enforcement action, the delay caused by defendant's locked gate would also create an unreasonable risk that defendant would destroy evidence before agents could enter and secure the premises. Moreover, as noted above, agents anticipate simultaneously executing a warrant to search the main at the premises, where FRANCISCO MENDEZ-NUNEZ resides, further heightening the danger and risk of the destruction of evidence.

### 2. The premises known as 4730 S. Bishop, Unit 2, Chicago, Illinois (the residence of SALVADOR GARCIA)

117. The premises known as 4730 S. Bishop, Unit 2, Chicago, Illinois, is located in a two-unit building consisting of a two-story residence with tan siding. This premises is located on the west side of Bishop Street, south of 47th Street. The address of the building is partially displayed in red numerals (**30) on the awning above the burgundy and white painted main entry doors. The door positioned to the south provides access to the first floor apartment (Unit 1) and the door positioned

68

to the north provides access to the second floor apartment (Unit 2). The residence is enclosed by a four-foot chain link fence. Additionally, the residence has a two-car, detached garage with tan and brown siding and a standard dark brown overhead door. The garage has a Direct T.V. satellite dish affixed to the roof of the garage. Affiant seeks authority to search Unit 2 only.

118.    Physical surveillance conducted throughout the investigation, including on or about November 26, 2007 and on or about December 17, 2007, has revealed that SALVADOR GARCIA currently resides in the second floor apartment accessed through the north door (the door positioned to the right when facing the apartment). In particular, on or about December 17, 2007 an agent observed SALVADOR GARCIA entering and exiting the second floor apartment. During the course of this investigation, agents have conducted fixed surveillance at 4730 S. Bishop, Chicago, Illinois, and have observed SALVADOR GARCIA and a vehicle utilized by SALVADOR GARCIA arrive and leave the premises at various hours of the day and night. In addition, a check with the Illinois Secretary of State on SALVADOR GARCIA's driver's license revealed that SALVADOR GARCIA lives at 4730 S. Bishop, Chicago, Illinois. Further, a search of ComEd's records revealed that utilities for 4730 S. Bishop, Unit 2, Chicago, Illinois, are listed in the name of a Hector Bojorquez. On or about September 28, 2007, at approximately 3:42 p.m., (Call Session 2312), a call was intercepted between Target Phone 2 and a telephone number subscribed to Hector Bojorquez. In the call, SALVADOR GARCIA told the person using the telephone number subscribed to Hector Bojorquez that he (SALVADOR GARCIA) had paid the utility bill. Therefore, I believe that SALVADOR GARCIA lives with a flat mate, Hector Bojorquez, in Unit 2.

119.    As described in detail above, SALVADOR GARCIA is a co-conspirator in a high volume drug distribution business in Chicago. The investigation has revealed that SALVADOR

GARCIA has utilized the premises to be searched in furtherance of those activities, including storing drugs and drug proceeds. For example on approximately September 1, 2007, at approximately 12:23 p.m., (Call Session 996), SALVADOR GARCIA received an incoming call on Target Phone 2 from Individual I. During the conversation Individual I complained to SALVADOR GARCIA the drugs he previously sold him were of a poor quality to which SALVADOR GARCIA responded, "That is the way that I got it, and I still have like seven at home. "[SALVADOR GARCIA told Individual I he has 7 more ounces at home.][16] Throughout the investigation agents have made two controlled buys from SALVADOR GARCIA and observed other drug transactions. See paragraphs 72-88. In addition, as described in paragraph, 84, on or about August 21, 2007, FRANCISCO MENDEZ-NUNEZ requested that SALVADOR GARCIA send narcotics proceeds to Mexico.

### 3.     The premises known as 3706 S. Paulina, Unit 1F, and detached garage, Chicago, Illinois (the residence of JAVIER GARCIA)

120.     The premises known as 3706 S. Paulina, Unit 1F, Chicago, Illinois, including detached garage, is located at a two-unit building consisting of a tan-siding residence with a basement apartment. The premises is located on the west side of Paulina Street, south of 37th Street. The address of the building is displayed diagonally in black numerals (3706) on the front of the residence just south of the main entry door. Unit 1F is on the first/main floor of the two unit-building, with the entrance in the front of the building, just inside a six-foot decorative wrought iron fence that encloses the front of the residence, at the top of a short set of stairs. The entrance to the second unit is down a set of stairs, which are located just behind the stairs leading to the first/main floor of the building.

---

[16]The transaction between on SALVADOR GARCIA and Individual I was video recorded by agents.

The residence has detached two-car garage with tan siding, which has a white standard overhead garage door.

121.    Physical surveillance conducted throughout the investigation, including in December 2007, has revealed that JAVIER GARCIA currently resides in the first floor apartment at the premises. In particular, agents have observed JAVIER GARCIA entering and exiting the first/main floor unit. In addition, on October 27, 2007, at approximately 4:12 p.m., (Call Session 1071), FRANCISCO MENDEZ-NUNEZ received an incoming call on Target Phone 3 from JAVIER GARCIA. During the call, FRANCISCO MENDEZ-NUNEZ said, "Are you at home?" JAVIER GARCIA replied, "Yeah. We're still...." FRANCISCO MENDEZ-NUNEZ said, "Okay." JAVIER GARCIA said, "I'm here, yeah." FRANCISCO MENDEZ-NUNEZ said, "Okay, I'll be there, I'll be there in about 10 minutes." At approximately 4:51 p.m., surveillance followed and observed FRANCISCO MENDEZ-NUNEZ arrive at 3706 S. Paulina, Chicago, Illinois. During the course of this investigation, agents have conducted fixed surveillance at 3706 S. Paulina, Chicago, Illinois, and have observed JAVIER GARCIA and vehicles utilized by and registered to JAVIER GARCIA arrive and leave the residence at various hours of the day and night. Surveillance has also revealed that JAVIER GARCIA frequently meets individuals inside the detached garage of the premises. Finally, according to records provided by the Chicago Water Company and ComEd, JAVIER GARCIA pays the utility bills for Unit 1F at 3706 S. Paulina, Chicago, Illinois and a Lexis Nexis search of the residence indicated that JAVIER GARCIA resides 3706 S. Paulina St., Apt. 1, Chicago, Illinois.

122.    As described in detail above, JAVIER GARCIA is supplying FRANCISCO MENDEZ-NUNEZ's organization with wholesale amounts of drugs. For example, as described in paragraphs 37-41, JAVIER GARCIA instructed his brother-in-law FRANCISCO SOTO to distribute

an amount of drugs to SALVADOR GARCIA. Based on the phone calls recounted in the above-referenced paragraphs, SALVADOR GARCIA later paid JAVIER GARCIA for the drugs. In addition, as described in paragraphs 47-52, JAVIER GARCIA also distributed wholesale amounts of cocaine to FRANCISCO MENDEZ-NUNEZ.

123.    Based on the facts contained in this affidavit, your Affiant believes that probable cause exists to search the premises and that such a search will result in the seizure of items described in paragraph 101 of this document and that seizure of such items will be of evidentiary value in this investigation. In particular, due to the fact that JAVIER GARCIA is a wholesale distributor of controlled substances it is likely that his residence contains books, ledgers, receipts and other papers relating to the procurement, distribution, storage, and transportation of controlled substances, along with the other categories of items set forth in paragraph 101.

### 4.    The premises known as 5207 S. Rockwell Street, Unit 1, Chicago, Illinois (the residence of JUAN DURAN)

124.    The premises known as 5207 S. Rockwell Street, Unit 1, Chicago, Illinois, is located in a two-story building consisting of two units, one on the first floor and one on the second floor. The building has a single white front door with the numbers 5207 in black located south of the door. The building has old red and gray siding on the front, with all gray shingle-style siding on the side. The rear of the building has light tan siding. There are two air conditioners protruding from the front of the building, one from the second floor window and the other mounted through the wall on the third floor. The garage has a brown service door with light tan wood trim and a chain link gate that leads into the yard. The building is on the east side of Rockwell and is the third premises south of 52nd street. There is an elementary school located across the street from the residence.

125.    Physical surveillance conducted throughout the investigation, including on or about December 17, 2007, has revealed that JUAN DURAN resides at 5207 S. Rockwell Street. According to records provided by ComEd, JUAN DURAN pays the utility bills for Unit 1. In addition a Lexis Nexis search revealed JUAN DURAN resides at 5207 S. Rockwell Street, Apt. 1F, Chicago, Illinois. On October 14, 2005, JUAN DURAN was issued an Illinois driver's license, which listed his residence as 5207 S. Rockwell Street, Chicago, Illinois. On November 5, 2007, at approximately 4:25 p.m., agents observed JUAN DURAN enter a silver 4-door Buick bearing Illinois license plates 6055715, which is registered to JUAN DURAN at 5207 S. Rockwell Street, Chicago, Illinois. At approximately 4:50 p.m., agents observed DURAN arrive at 5207 S. Rockwell and enter the front door of the residence.    During the course of this investigation agents have conducted fixed surveillance at 5207 S. Rockwell Street, Chicago, Illinois, and have observed JUAN DURAN and a vehicle utilized by JUAN DURAN  arrive and leave the residence at various hours of the day and night. On or about December 17, 2007, uniformed CPD officers conducted a well-being check at the residence by knocking on the main exterior entry door.  A man who identified himself as JUAN DURAN appeared from the interior door into the first floor apartment and spoke with the officers.

126.    As described in detail above, JUAN DURAN is supplying FRANCISCO MENDEZ-NUNEZ with wholesale quantities of drugs.  For example, as described in paragraphs 17-30, JUAN DURAN supplied at least two kilograms of cocaine to FRANCISCO MENDEZ-NUNEZ on October 30, 2007, which FRANCISCO MENDEZ-NUNEZ then re-distributed to OSCAR ANDRADE the next day. Based on surveillance and intercepted calls on Target Phone 3, your Affiant believes that JUAN DURAN is supplying additional large amounts of cocaine to FRANCISCO MENDEZ-NUNEZ.

127.    Based on the facts contained in this affidavit, your Affiant believes that probable cause exists to search the premises and that such a search will result in the seizure of items described in paragraph 101 of this document and that seizure of such items will be of evidentiary value in this investigation. In particular, due to the fact that JAVIER GARCIA is a wholesale distributor for the organization it is likely that his residence contains books, ledgers, receipts and other papers relating to the procurement, distribution, storage, and transportation of controlled substances, along with the other categories of items set forth in paragraph 101.

5.      **The premises known as 2014 S. Blue Island Avenue, Unit 2R, Chicago, Illinois (the residence of VICTOR VELAZQUEZ)**

128.    The premises known as 2014 S. Blue Island Avenue, Unit 2R, Chicago, Illinois, is located in a multi-unit blue and grey framed building. The building is located on the west side of Blue Island Avenue, south of the intersection at 21st Street. The address of the building is displayed on the left side of a white door on the north end of the building of the residence. There are two doors located in front of the building, one north and one south. During surveillance, agents have observed VICTOR VELAZQUEZ utilizing keys while entering the north door, which, based on its location, leads upstairs. There is a detached garage belonging to the address. The garage is a brick structure with a brown door. On the top of the door there is a black makeshift basketball hoop which was made from a small plastic crate. There is no visible address identifiers displayed anywhere on the garage.

129.    According to Cook County records, 2014 Blue Island Avenue is a four-unit building. Physical surveillance conducted throughout the investigation, including in December 2007, has revealed that VICTOR VELAZQUEZ resides in a unit accessible from the north door. During the course of this investigation agents have conducted fixed surveillance at 2014 Blue Island Avenue and

have observed VICTOR VELAZQUEZ and a vehicle utilized by VICTOR VELAZQUEZ arrive and leave the residence at various hours of the day and night. According to records provided by ComEd, VICTOR VELAZQUEZ pays the utility bill at Unit 2R. In addition a Lexis Nexis search showed that VICTOR VELAZQUEZ resides at 2014 Blue Island Avenue, Apt. 2R, Chicago, Illinois, and 2014 Blue Island Ave., 2nd Floor. Further, as described below in the following paragraph, VICTOR VELAZQUEZ was intercepted indicating that he forgot something "upstairs."

130.    As described in detail above, VICTOR VELAZQUEZ purchase wholesale amounts of drugs from FRANCISCO MENDEZ-NUNEZ then re-distributes the drugs to customers including SALVADOR GARCIA. The investigation has revealed that VICTOR VELAZQUEZ has utilized the premises to be searched in furtherance of those activities. As described in paragraphs 72-74, SALVADOR GARCIA purchased an unknown amount of drugs from VICTOR VELAZQUEZ in the alley near VICTOR VELAZQUEZ's residence. During the calls SALVADOR GARCIA asked, "Are you there, or not?" VICTOR VELAZQUEZ responded, "I'm here already. Just come here, and I'll come out to the back. What side, what side are you going to be on?" SALVADOR GARCIA said, "I'm over here by Loomis." VICTOR VELAZQUEZ said, "Okay." SALVADOR GARCIA said, "I'm, I'm going to [U/I]..." VICTOR VELAZQUEZ then said, "I'm going to...it's that I forgot the card upstairs. So just, just go to the back and I'll come out." At approximately 2:35 p.m., Agents observed SALVADOR GARCIA arrive in the area behind 2014 S. Blue Island Avenue in a purple Mustang bearing Illinois license plates 6039979. A short time later, agents observed and video recorded VICTOR VELAZQUEZ arrive in a white Chevrolet Suburban bearing Illinois license plates 3061212, which is registered to VICTOR VELAZQUEZ at 2014 S. Blue Island Avenue. Agents then observed GARCIA approach the driver's side window of VELAZQUEZ'S vehicle. Moments later GARCIA

75

placed his right hand in his pant pocket and walked back to and entered the Mustang and departed the area. Subsequent to the meeting, SALVADOR GARCIA phoned VICTOR VELAZQUEZ and stated, "You came up short." Based on the intercepted calls and surveillance, your Affiant believes SALVADOR GARCIA purchased an amount of drugs from VICTOR VELAZQUEZ at his residence.

131.    Based on the facts contained in this affidavit, your Affiant believes that probable cause exists to search the premises and that such a search will result in the seizure of items described in paragraph 101 of this document and that seizure of such items will be of evidentiary value in this investigation. In particular, due to the fact that VICTOR VELAZQUEZ is re-distributing wholesale quantities of cocaine it is likely that he is servicing a high volume of customers, making it probable that his residence contains books, ledgers, receipts and other papers relating to the procurement, distribution, storage, and transportation of controlled substances, along with the other categories of items set forth in paragraph 101.

## VII.    SUMMARY

132.    Based upon the foregoing, I respectfully submit there is there is probable cause to believe that beginning not later than in or about July 2006 and continuing through in or about December 2007, in Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants did conspire with each and with others to possess with intent to distribute and to distribute a controlled substance, namely, in excess of five hundred grams of mixtures and substances containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1); in violation of Title 21, United States Code, Section 846. I respectfully request that this Court issue the warrants sought herein.

FURTHER AFFIANT SAYETH NOT.

Matthew W. Holbrook, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before
me this 19th day of December 2007.

SIDNEY I. SCHENKIER
U.S. MAGISTRATE JUDGE